UNITED STATES of America,
Plaintiff–Appellee,

v.

Ross Allen DOHERTY, Defendant–Appellant.

No. 95–2231.

United States Court of Appeals,
Sixth Circuit.

Argued March 27, 1997.

Decided Sept. 15, 1997.

Rehearing and Rehearing En Banc
Denied Oct. 30, 1997.*

* Merritt, Circuit Judge, would grant rehearing.

Jeffery J. Davis (argued), Office of the U.S. Attorney, Grand Rapids, MI, Judd R. Spray (briefed), Office of the U.S. Attorney, Marquette, MI, for Plaintiff–Appellee.

Paul L. Mitchell (argued and briefed), Grand Rapids, MI, for Defendant–Appellant.

Before: MERRITT, KRUPANSKY, and BOGGS, Circuit Judges.

BOGGS, J., delivered the opinion of the court, in which KRUPANSKY, J., joined. MERRITT, J. (pp. 783–85), delivered a separate opinion concurring in part and dissenting in part.

BOGGS, Circuit Judge.

Ross Allen Doherty, a Native American and a resident of the Hannahville Indian Community tribal reservation, was convicted in the United States District Court for the Western District of Michigan of two counts of knowingly engaging in a sexual act with a child, in violation of 18 U.S.C. § 2243(a), as made applicable to tribal reservations by the Major Crimes Act, 18 U.S.C. § 1153(a). Doherty now appeals, arguing that the introduction into evidence of his signed confession violated his Fifth and Sixth Amendment rights. We affirm.

## I. Background

The Hannahville Indian Community is a tribal reservation of approximately 300 persons located in the Upper Peninsula of Michigan.[1] On February 8, 1995, Amy Hay, a children's protective-services worker employed by Hannahville, interviewed a 13–year–old child who was a resident of the reservation. After speaking with the child, Hay suspected that the girl may have been sexually molested by her mother's common-law husband, Ross Allen Doherty, who lived with her, her mother, and her sister and brothers. Accordingly, Hay secured a medical examination for the girl and arranged that she be placed in a foster care home. Hay's suspicions were brought to the attention of the Hannahville Indian Community Tribal Police and to agents of the Bureau of

Indian Affairs (BIA) and the Federal Bureau of Investigation (FBI). On the same day, Doherty was arrested by the Tribal Police.

Doherty was arraigned in the Hannahville Indian Community Tribal Court the next day, February 9. The tribal judge informed him that he was being charged with statutory rape. Under Hannahville's criminal offenses code, that crime is defined to include sexual penetration of a child older than 12 years of age by a person who is a member of the same household as the child. The maximum penalty for such a violation is one year in prison and a fine of $5000, the greatest penalty that tribal courts are authorized to impose under 25 U.S.C. § 1302(7). The judge informed Doherty that he had the right to retain counsel at his own expense, and asked him whether he wished to do so. Doherty responded affirmatively, and indicated that at that time his mother was attempting to locate a lawyer. Accordingly, shortly before noon, the judge continued the arraignment so that Doherty could obtain a lawyer.

Doherty was then taken to the tribal police station, where he remained in custody. David Kleinpaste, a special agent of the FBI, suspected that Doherty's alleged violation of the tribal statutory rape law may also have been a violation of federal law. Accordingly, he accompanied Levi Carrick, an agent of the BIA, to the police station and asked to speak with Doherty. Doherty had not yet spoken with a lawyer at that time, and the record does not reveal whether a lawyer had in fact been retained at that time. Nonetheless, Doherty agreed to speak with the federal agents.

Before the interview began, at approximately 2:40 p.m., Agent Kleinpaste asked Doherty to read an advice-of-rights form. Agent Kleinpaste then read through the form line by line with Doherty, pausing after each line to ascertain that Doherty understood his rights, including the right to remain silent, the right to have a lawyer present during questioning, and the right to stop speaking

---

1. Its members are descendants of the Potawatomi Indians, whose status as a sovereign nation has been acknowledged by the federal government in numerous treaties. Accordingly, Hannahville has been recognized as a distinct tribe by Congress. *See* 25 U.S.C. § 1300j(1), (4).

and to request a lawyer at any time during the interview. Significantly, Agent Kleinpaste also explained to Doherty that, while he had no such right in the tribal court, he had the right to have a lawyer appointed for him at government expense for the purposes of the interview. Doherty signed a waiver form indicating that he understood his rights and that he elected voluntarily to proceed with the interview. Agent Kleinpaste later testified that Doherty "was aware of the fact that we were there for the very same incident which caused him to be in custody at that moment, the fact that an allegation had been made that he had touched these children in an inappropriate manner." The interview lasted about three hours. During the course of the interview, Doherty admitted that he had sexually abused his two stepdaughters and that he could not control the compulsion he felt to do so. At the conclusion of the interview, Doherty signed a confession that indicated that he had sexually molested his two stepdaughters on numerous occasions over a period of seven years.

On February 28, 1995, a grand jury of the United States District Court for the Western District of Michigan indicted Doherty on two counts of engaging in a sexual act with a child, in violation of 18 U.S.C. §§ 1153(a) and 2243(a). A superseding indictment added a third count charging Doherty with engaging in a sexual act with a child who has not reached the age of 12 years, in violation of 18 U.S.C. § 2241(c), which is also made applicable to acts committed on Indian reservations by 18 U.S.C. § 1153(a). Doherty filed a motion to suppress the confession, which was denied by the district court.

Doherty's case was tried on August 8 and August 9, 1995. At trial, Agent Kleinpaste read Doherty's confession into evidence. Doherty's stepdaughter testified at trial that Doherty had engaged in sexual acts with her on three different occasions. She testified that on one occasion, shortly before her twelfth birthday, Doherty pushed her into her mother's bedroom and engaged in sexual intercourse with her. She also testified that, when she was thirteen years old, on one occasion he pushed her into her mother's bedroom and touched her in a sexual man-

ner, and on another occasion he pulled her out of her bed and engaged in sexual intercourse with her. She further testified that she never told anybody about the molestations before her interview with Amy Hay because Doherty "said that he would kill me, my sister, and my ma, and I knew he would." On cross examination, some confusion developed over the precise timing of the first incident of sexual abuse. The jury convicted Doherty of the two counts under 18 U.S.C. § 2243(a), but, presumably because of the confusion over the timing, acquitted him of the count under 18 U.S.C. § 2241(c), which required proof that the victim was under twelve years of age. The court sentenced Doherty to consecutive terms of imprisonment of 180 months and 113 months. Doherty now appeals.

## II. Fifth Amendment

Doherty first alleges that his February 9 confession violated his Fifth Amendment right against compelled self-incrimination. While we review the ultimate legal conclusion of voluntariness de novo, we review the district court's determination of primary historical facts only for clear error. *See United States v. Wrice,* 954 F.2d 406, 410–11 (6th Cir.1992). Both Agent Kleinpaste and Agent Carrick testified at the hearing on the motion to suppress. According to their testimony, Agent Kleinpaste read the waiver-of-rights form with Doherty line by line, and ascertained that Doherty understood each sentence. Agent Kleinpaste informed Doherty at the beginning of the interview that he had the right to have an appointed attorney present during the interview, and asked him whether he had an attorney in the tribal court. Doherty responded that he did not, but that his mother was going to retain one. Agent Kleinpaste testified that Doherty understood that, while he did not have the right to an appointed attorney in tribal court, he did have such a right for the purposes of the interview. However, Doherty never requested the presence of an attorney at any time during the interview. At the conclusion of the interview, Agent Kleinpaste followed the same procedure as he did before with respect to the waiver of rights form; he read through

the written confession line by line and ascertained that Doherty understood each sentence. After the interview, Doherty stated that he wished to be the first person to tell his common-law wife that he had confessed to abusing his stepdaughters.

Doherty testified at the evidentiary hearing that he didn't recall Agent Kleinpaste reading his rights to him, that during the interview he requested an attorney "[s]omewhere between four and ten times," and that Agent Kleinpaste told him that he didn't need an attorney because the letter that he would sign would establish his innocence. The district court found Doherty's version of events to be incredible, and we cannot state that this finding was clear error. Therefore, we take the federal agents' version of the facts as correct.

■ Doherty argues that his statement that his mother was attempting to locate an attorney constituted a request for an attorney, and that thereby the federal agents were required to cease their questioning of him. Under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), a suspect in custodial interrogation has the right under the Fifth Amendment to have an attorney present during such interrogation, and government agents are required to inform the suspect of that right. While the suspect may waive his right to the presence of an attorney, the burden of proof is on the government to establish by a preponderance of the evidence that such a waiver was made knowingly, intelligently, and voluntarily. *See Davis v. United States*, 512 U.S. 452, 458, 114 S.Ct. 2350, 2354, 129 L.Ed.2d 362 (1994); *Miranda*, 384 U.S. at 475, 86 S.ct. at 1628. We believe that the government has made such a showing here; Agent Kleinpaste carefully explained to Doherty his rights, and Doherty voluntarily elected to proceed with the interview.

■ Doherty relies on the rule of *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), that where a suspect has invoked his Fifth Amendment right to counsel, any subsequent *Miranda* waiver is involuntary as a matter of law unless counsel is present or the suspect himself reinitiates the conversation. However,

the suspect must unambiguously request counsel. As we have observed, a statement either is such an assertion of the right to counsel or it is not. Although a suspect need not speak with the discrimination of an Oxford don, he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, *Edwards* does not require that the officers stop questioning the suspect.

*Davis*, 512 U.S. at 459, 114 S.Ct. at 2355 (internal quotations omitted). Doherty never made such an unambiguous request. After Agent Kleinpaste asked whether he had an attorney in the tribal court, Doherty responded only that he did not but that his mother was going to retain one. Agent Kleinpaste informed him of his right to have an appointed attorney present during the interview, but Doherty never requested such an appointment. Doherty not only failed to invoke his Fifth Amendment right to counsel "sufficiently clearly," he failed to invoke his right to counsel at all in a circumstance where it would have been completely natural to ask to wait for his retained attorney, or for a government-appointed attorney.

■ Doherty argues that his earlier statement in the tribal court that his mother was attempting to retain counsel should be interpreted as a matter of law under the Fifth Amendment as a request for counsel in the custodial interrogation. However, the Supreme Court has rejected any per se rule that a simple request for counsel at an arraignment also invokes the Fifth Amendment right to counsel for the purposes of a custodial interrogation:

It can be said, perhaps, that it is likely that one who has asked for counsel's assistance in defending against a prosecution would want counsel present for all custodial interrogation, even interrogation unrelated to the charge. That is not necessarily true, since suspects often believe that they can avoid the laying of charges by demonstrating an assurance of innocence through frank and unassisted answers to questions. But even if it were true, the likelihood that a suspect would wish counsel to be present

is not the test for applicability of *Edwards*. The rule of that case applies only when the suspect has expressed his wish *for the particular sort of lawyerly assistance that is the subject of Miranda.* ... To find that the defendant invoked his Fifth Amendment right to counsel on the present charges merely by requesting the appointment of counsel at his arraignment on the unrelated charge is to disregard the ordinary meaning of that request.

*McNeil v. Wisconsin,* 501 U.S. 171, 178–79, 111 S.Ct. 2204, 2209, 115 L.Ed.2d 158 (1991) (internal quotations omitted) (emphasis added).

The Supreme Court's rejection of a per se rule is fatal to Doherty's Fifth Amendment claim, because under the facts of this case Doherty's statement in the tribal court did not constitute a request for counsel in a later custodial interrogation for purposes of the Fifth Amendment. As noted above, under *Edwards,* police are prohibited from initiating an interrogation with a suspect if the suspect requests counsel and counsel has not yet arrived, but as *Davis* establishes, the police are only so prohibited if the suspect requests counsel in the custodial interrogation "sufficiently clearly." Just as Doherty's statement to Agent Kleinpaste that his mother was hiring an attorney did not clearly invoke his right to counsel in the interrogation, his prior statement in the tribal court to the same effect also did not invoke his Fifth Amendment right to counsel for the purposes of a subsequent custodial interrogation. Despite the fact that he had ample opportunity to do so, Doherty never requested "the particular sort of lawyerly assistance that is the subject of *Miranda.*" Thus, both his waiver of his Fifth Amendment right to counsel in the interview and his subsequent confession were knowing, intelligent, and voluntary both as a matter of fact and under the Fifth Amendment prophylactic rules of *Miranda* and *Edwards.*

### III. Sixth Amendment

**A. *The Sixth Amendment Right to Counsel Would Require Suppression of Doherty's Confession, Had that Right Attached***

Doherty next argues that the confession is invalid as a violation of his Sixth Amendment right to counsel. Were the Sixth Amendment applicable here—which it is not, as we shall see in Part B below—we would agree that Doherty's right to counsel had been infringed in this case. In *Massiah v. United States,* 377 U.S. 201, 204, 84 S.Ct. 1199, 1201, 12 L.Ed.2d 246 (1964), the Supreme Court held that the Sixth Amendment requires the suppression from evidence of a confession "which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel." *Id.* at 206, 84 S.Ct. at 1203. The Court has since relied on *Massiah* to hold that, under the Sixth Amendment, "if police initiate interrogation after a defendant's assertion, at an arraignment or similar proceeding, of his right to counsel, any waiver of the defendant's right to counsel for that police-initiated interrogation is invalid." *Michigan v. Jackson,* 475 U.S. 625, 636, 106 S.Ct. 1404, 1411, 89 L.Ed.2d 631 (1986).

Because the Fifth and Sixth Amendments protect different interests—the former, a suspect's "desire to deal with the police only through counsel" with regard to any matter, *Edwards,* 451 U.S. at 484, 101 S.Ct. at 1885, and the latter, to "protec[t] the unaided layman at critical confrontations" with the government during the course of a prosecution, *United States v. Gouveia,* 467 U.S. 180, 189, 104 S.Ct. 2292, 2298, 81 L.Ed.2d 146 (1984)—the Sixth Amendment right to counsel is both broader and narrower than the parallel right afforded by the Fifth Amendment. It is broader because, unlike the Fifth Amendment, the Sixth Amendment prescribes a per se rule that police may not question a suspect after he has asserted his right to counsel at his arraignment, unless counsel is present. *Compare Jackson,* 475 U.S. at 629–30, 106 S.Ct. at 1407–08, *with McNeil,* 501 U.S. at 177–78, 111 S.Ct. at 2208–09. It is narrower in that the per se rule generally applies only with respect to the same offense as that on which the suspect had been arraigned. *See McNeil,* 501 U.S. at 175–76, 111 S.Ct. at 2207–08; *Maine v. Moulton,* 474 U.S. 159, 179–80, 106 S.Ct. 477, 488–89, 88 L.Ed.2d 481 (1985).

It could be argued that *Massiah* and its progeny dictate that Doherty's confession be suppressed: Doherty stated at his arraignment that his mother was trying to hire counsel; he was interrogated before he spoke with a lawyer; his confession is presumed to be involuntary. Q.E.D. The government argues that the Sixth Amendment is inapplicable in this case, since Doherty was not arraigned in tribal court on the same offense on which he was tried in federal court. Because the elements of the two offenses are not identical, and because the two prosecutions were brought by different sovereigns, the government argues, the federal indictment was based on a "new or additional crime[ ]," *Moulton,* 474 U.S. at 179, 106 S.Ct. at 489, and thus the Sixth Amendment right to counsel had not yet attached with respect to the federal charges.

The difficulty with the government's position is that it ignores the disposition in *Moulton* itself, which affirmed the state court's reversal of both a conviction for theft and a conviction for burglary. Moulton had already been indicted for theft at the time of his confession, but had not yet been indicted for burglary, despite the fact that the two charges were based on essentially the same underlying facts. *See id.* at 165–68, 106 S.Ct. at 481–83. Similarly, in *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977), the Court reversed on Sixth Amendment grounds a murder conviction resulting from the defendant's confession given before his indictment for murder, but after his indictment on a charge of kidnapping based on the same facts. In dicta, the Supreme Court has suggested further that it is the subject matter of the interrogation, and not any formal distinction in the elements of the underlying charges, that is relevant for Sixth Amendment purposes: "In the instant case no charges had been filed on the *subject* of the interrogation, and our Sixth Amendment precedents are not applicable." *Illinois v. Perkins,* 496 U.S. 292, 299, 110 S.Ct. 2394, 2399, 110 L.Ed.2d 243 (1990) (emphasis added).

Thus, every court that has considered the issue has recognized that the Sixth Amendment right to counsel extends to interrogations on new charges where "the pending charge is so inextricably intertwined with the charge under investigation that the right to counsel for the pending charge cannot constitutionally be isolated from the right to counsel for the uncharged offense." *United States v. Hines,* 963 F.2d 255, 257 (9th Cir.1992). Such a rule follows almost by necessity from *Massiah* and *Jackson:* "To hold otherwise would allow the government to circumvent the Sixth Amendment right to counsel merely by charging a defendant with additional related crimes after questioning him without counsel present." *United States v. Arnold,* 106 F.3d 37, 41 (3d Cir.1997) (internal quotation and brackets omitted); *see United States v. Kidd,* 12 F.3d 30, 33 (4th Cir.1993); *United States v. Cooper,* 949 F.2d 737, 743–44 (5th Cir.1991); *United States v. Mitcheltree,* 940 F.2d 1329, 1342–47 (10th Cir.1991); *United States v. Rodriguez,* 931 F.Supp. 907, 926–27 (D.Mass.1996); *People v. Clankie,* 124 Ill.2d 456, 125 Ill.Dec. 290, 530 N.E.2d 448 (1988); *see also United States v. Dixon,* No. 90–3734, 1991 WL 161998, at *2 (6th Cir. Aug. 22, 1991). The mere fact that the two charges are brought by different sovereigns is irrelevant to this analysis, at least where the record suggests that officials of the two sovereigns are cooperating in their respective investigations. *See United States v. Laury,* 49 F.3d 145, 150 n. 11 (5th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 162, 133 L.Ed.2d 105 (1995); *United States v. Martinez,* 972 F.2d 1100, 1105 (9th Cir.1992); *Rodriguez,* 931 F.Supp. at 927.

The question of how "inextricably intertwined" two offenses must be so that the Sixth Amendment right to counsel attaches simultaneously with respect to both offenses is open to some doubt, and we leave consideration of that question to another day. In the present case, Doherty was interrogated by federal agents with regard to the identical activities that were the subject of the tribal court charge. Given that precisely the same underlying conduct formed the basis for both charges, Doherty's Sixth Amendment right to counsel would have attached with respect to the federal charges at the same time that it did with respect to the tribal charges—if the tribal arraignment created such a right.

## B. *The Sixth Amendment Right to Counsel Did Not Attach at Doherty's Tribal Court Arraignment*

■ But it did not. Neither the Sixth Amendment nor any of the other guarantees of individual rights in the United States Constitution apply of their own force to Indian tribes. In *Talton v. Mayes*, 163 U.S. 376, 16 S.Ct. 986, 41 L.Ed. 196 (1896), the Supreme Court considered whether the criminal courts of the Cherokee Nation were required under the Fifth Amendment to prosecute cases only after an indictment by a grand jury, and answered that question in the negative. The Court reasoned that, since the Indian tribes are "distinct, independent political communities, retaining their original rights," *id.* at 383, 16 S.Ct. at 989, *quoting Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 559, 8 L.Ed. 483 (1832) (Marshall, C.J.), the mere fact that they are subject to federal regulation does not render them arms of the federal government for purposes of the Fifth Amendment:

> But the existence of the right in congress to regulate the manner in which the local powers of the Cherokee Nation shall be exercised does not render such local powers federal powers arising from and created by the constitution of the United States. It follows that, as the powers of local self-government enjoyed by the Cherokee Nation existed prior to the constitution, they are not operated upon by the fifth amendment, which, as we have said, had for its sole object to control the powers conferred by the constitution on the national government.

*Talton*, 163 U.S. at 384, 16 S.Ct. at 989.

Of course, *Talton* was decided decades before most of the protections of the Bill of Rights were held to be binding on the states through the Fourteenth Amendment, *see, e.g., Duncan v. Louisiana*, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968). Furthermore, the specific provision at issue in *Talton*, the right to indictment by a grand jury, to this day has not been held to operate on the states, and the Court relied on its prior decision in *Hurtado v. California*, 110 U.S. 516, 4 S.Ct. 111, 28 L.Ed. 232 (1884), to that effect to buttress its holding. *Talton*, 163 U.S. at 384–85, 16 S.Ct. at 989–90. Nonetheless, *Talton* has come to stand for the proposition that neither the Bill of Rights nor the Fourteenth Amendment operates to constrain the governmental actions of Indian tribes, and the Supreme Court has consistently decided cases with that understanding. "As separate sovereigns pre-existing the Constitution, tribes have historically been regarded as unconstrained by those constitutional provisions framed specifically as limitations on federal or state authority.... [T]he lower federal courts have extended the holding of *Talton* to other provisions of the Bill of Rights, as well as to the Fourteenth Amendment." *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 56, 98 S.Ct. 1670, 1675–76, 56 L.Ed.2d 106 (1978); *see also Duro v. Reina*, 495 U.S. 676, 693, 110 S.Ct. 2053, 2063–64, 109 L.Ed.2d 693 (1990).

It may seem to be an odd rule that Indian tribes are the only governmental entities within the borders of the United States that are not constrained to act within constitutional limitations. This oddity may be dispelled, however, by a review of first principles. The federal government is bound to obey the Constitution because it was created by the ratification of that document, and the states are similarly so bound because they voluntarily elected to join the federal union subject to its terms, one of which, the Fourteenth Amendment, imposes substantive restrictions on the actions of states.

■ However, there is no Fourteenth Amendment for the Indian tribes. The Constitution is essentially silent with regard to Indian tribes: "To the extent Indian tribes are discussed in the Constitution, they seem to be recognized as having a status outside its parameters. Indian tribes are treated as entities with whom to have commerce and to make treaties." Judith Resnik, *Dependent Sovereigns: Indian Tribes, States, and the Federal Courts*, 56 U. CHI. L.REV. 671, 691 (1989). This is so because the tribes did not participate in the Constitutional Convention, and never formally consented to join the union. Accordingly, the tribes exercise powers of self-government not pursuant to a Constitutional grant of authority, but pursuant to their status as sovereigns under principles of international law. *See* Philip P.

778

Frickey, *Domesticating Federal Indian Law,* 81 Minn. L.Rev. 31, 66 (1996); Robert N. Clinton, *Tribal Courts and the Federal Union,* 26 Willamette L.Rev. 841, 845–46 (1990). Although the tribes are subject to broad federal power, "until Congress acts, the tribes retain their existing sovereign powers. In sum, Indian tribes still possess those aspects of sovereignty not withdrawn by treaty or statute, or by implication as a necessary result of their dependent status." *United States v. Wheeler,* 435 U.S. 313, 323, 98 S.Ct. 1079, 1086, 55 L.Ed.2d 303 (1978). Because the power to enforce their criminal laws is one of the sovereign powers that the tribes have not relinquished, *id.* at 323–24, 98 S.Ct. at 1086–87, it follows that the Sixth Amendment does not limit that power, and the Hannahville Indian Community was under no Constitutional duty to provide Doherty with counsel or to forego questioning him before he spoke with an attorney.

### C. A Federal Statute Provides for a Right to Retained Counsel in Tribal Court, But That Right Does Not Require the Suppression of Doherty's Confession

■ As noted above, despite the fact that the Indian tribes are not directly subject to constitutional restraints, Congress has broad authority to regulate Indian affairs.[2] Pursuant to that authority, in 1968, Congress enacted the Indian Civil Rights Act (ICRA), which imposes obligations on the Indian tribes that are substantially similar to those

imposed on the states by the Bill of Rights and the Fourteenth Amendment. Pub.L. No. 90–284, § 202, 82 Stat. 73, 77 (1968), *codified at* 25 U.S.C. § 1302. While ICRA tracks the language of some Constitutional provisions word for word—for example, Indian tribes are prohibited from "abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble and to petition for a redress of grievances," 25 U.S.C. § 1302(1)—it does not incorporate every provision of the Bill of Rights. Indian tribes are not prohibited from establishing religions, are not required to afford a trial by jury in civil cases, and, notably given the holding in *Talton,* are not prohibited from prosecuting criminal cases without an indictment by a grand jury.

■ ICRA provides for a right to counsel, but does not extend that right to the limits of the Sixth Amendment. "No Indian tribe in exercising powers of self-government shall . . . deny to any person in a criminal proceeding the right . . . at his own expense to have the assistance of counsel for his defense." 25 U.S.C. § 1302(6). Thus, the tribes are not required to provide counsel to the indigent accused in felony prosecutions, despite the Sixth Amendment holding to the contrary in *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). The question presented in this case is whether the right to counsel afforded by ICRA has the same effect in creating an exclusionary

**2.** The extent of Congress's power has been described as "plenary," *Wheeler,* 435 U.S. at 323, 98 S.Ct. at 1086, subject only to a "rational basis" test that the proposed federal action be reasonably related to the federal duty to protect the welfare of Native Americans, *see Morton v. Mancari,* 417 U.S. 535, 555, 94 S.Ct. 2474, 2485, 41 L.Ed.2d 290 (1974). Throughout the early years of the republic, the Supreme Court did not seem particularly concerned about locating the source of such plenary power in any particular provision in the Constitutional text; in one instance, the Court described plenary power, somewhat patronizingly, as the necessary result of the status of Native Americans as wards of the federal government. *See United States v. Kagama,* 118 U.S. 375, 384, 6 S.Ct. 1109, 1114, 30 L.Ed. 228 (1886) (upholding the Major Crimes Act). *Kagama's* explicit renunciation of any need to rely on the text of the Constitution, *see id.* at 378–79, 6 S.Ct. at 1110–11, has been described as an "em-

barrassment of logic," Frickey, 81 U.Minn. L.Rev. at 35, and appears no longer to be an accurate statement of the law. More recent cases have stated that federal power in this field rests on the Indian Commerce Clause, U.S. Const., art. I, § 8, cl. 3. *See, e.g., Cotton Petroleum Co. v. New Mexico,* 490 U.S. 163, 192, 109 S.Ct. 1698, 1715, 104 L.Ed.2d 209 (1989). Because neither party has raised the issue, we leave to another day the question of whether the newly re-affirmed limitations of the Interstate Commerce Clause, *see United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), also impose limits on federal power under the Indian Commerce Clause. *Cf. Seminole Tribe of Fla. v. Florida,* —— U.S. ——, ——, 116 S.Ct. 1114, 1127, 134 L.Ed.2d 252 (1996) (there is "no principled distinction" between the two commerce clauses for purposes of Congressional power to abrogate states' Eleventh Amendment immunity).

rule for post-arraignment confessions as does the Sixth Amendment under *Massiah* and *Jackson.*

Absent the *Gideon* qualifier, § 1302(6) substantially tracks the language of the Sixth Amendment, and it could fairly be argued that, outside of the context of the right to *appointed* counsel, Congress intended Indian tribes to be subject to the full scope of Sixth Amendment law, in Justice Harlan's memorable phrase, "jot-for-jot and case-by-case." *Duncan v. Louisiana,* 391 U.S. 145, 181, 88 S.Ct. 1444, 1465, 20 L.Ed.2d 491 (1968) (Harlan, J., dissenting) (arguing against total incorporation of Bill of Rights to the states). However, the mere fact that a statute's language is similar to that found in the Constitution has never been considered to be conclusive proof that Congress intended the statute to have the same meaning as the Constitutional provision. *See, e.g., Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 494–95, 103 S.Ct. 1962, 1971–72, 76 L.Ed.2d 81 (1983) (limits of "arising under" federal question jurisdiction imposed by Article III are broader than "arising under" jurisdiction authorized by 28 U.S.C. § 1331). Thus, we are obliged to review carefully the meaning of the words used by the Ninetieth Congress in enacting ICRA. We believe that a review of ICRA's legislative history reflects that Congress carefully balanced the desire to protect the rights of Native Americans with the desire to avoid extensive interference with internal tribal affairs, *see Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 62, 98 S.Ct. 1670, 1679, 56 L.Ed.2d 106 (1978), and that an imposition of the *Massiah* exclusionary rule on to Indian tribes would upset that careful balance.

ICRA began as a series of eight bills introduced by Senator Sam J. Ervin, Jr., in 1965, the first of which, S. 961, 89th Cong. (1965), was the precursor to the present § 1302. As originally proposed, it would have subjected tribal governments to the "same limitations and restraints as those which are imposed on the Government of the United States by the United States Constitution." In the same year, a Senate subcommittee held hearings on the proposed bills. *See Hearings on S. 961–968 and S.J. Res. 40 Before the Sub-*

*comm. on Constitutional Rights of the Senate Comm. on the Judiciary,* 89th Cong., 1st Sess. (1965) ("Hearings"). Throughout the hearings, S. 961 was intensely criticized as overly intrusive of the tribes' right of self-governance. In particular, tribal representatives testified that their governments could not afford to provide counsel to indigent defendants, and that a bill that required them to do so without providing for federal funding would be disastrous. *See* Hearings at 65, 131. Witnesses further testified that a wholesale exportation of the Sixth Amendment to the tribes would be not be feasible; since many tribes do not have prosecutorial systems, but instead rely on informal and non-adversarial questioning from the tribal courts, the introduction of outside defense counsel could "disrupt the entire court system." Hearings at 139. In response to such criticisms, the Department of the Interior offered an alternative bill that specified the particular rights to be applicable against tribal governments, which, "by giving consideration to each of the rights so extended," sought to preserve "the differences between Indian tribes and the U.S. Government." Hearings at 19. The alternative bill was the model for S. 1843, 90th Cong. (1967), which eventually was enacted into law as Pub.L. No. 90–284.

There is a paucity of case law under ICRA, given the Supreme Court's holding in *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 69, 98 S.Ct. 1670, 1679, 56 L.Ed.2d 106 (1978), that the act does not create a private cause of action. However, those courts that have considered ICRA have held that constitutional law precedents applicable to the federal and state governments do not necessarily apply "jot-for-jot" to the tribes. *See, e.g., Tom v. Sutton,* 533 F.2d 1101, 1104–05 (9th Cir.1976) (right to due process under ICRA does not require appointment of counsel for indigent defendants); *Wounded Head v. Tribal Council of Oglala Sioux Tribe,* 507 F.2d 1079, 1081 (8th Cir.1975) (ICRA does not incorporate Twenty–Sixth Amendment's requirement that eighteen-year-olds be afforded the right to vote); *Groundhog v. Keeler,* 442 F.2d 674, 678 (10th Cir.1971) (right to due process under ICRA does not establish same voting

rights as under the federal constitution).[3] The Bureau of Indian Affairs, which is charged under 25 U.S.C. § 450m with ensuring that the tribes perform their obligations under federal contracts in accordance with ICRA, has also recognized that a wholesale incorporation of federal constitutional standards would be unwise. *See Atchison, Topeka & Santa Fe Ry. Co. v. Deputy Area Director*, 14 I.B.I.A. 46, 66 (BIA 1986) (declining to decide whether narrower version of equal protection in ICRA invalidates tax on commercial leaseholds within tribal boundaries); *In re Attorney's Fees Request of Clabaugh*, 9 I.B.I.A. 294, 302–03 (BIA 1982) (ICRA does not afford a right to appointed counsel in child custody case). Furthermore, those courts charged under *Santa Clara Pueblo* with the primary responsibility for interpreting ICRA, the tribal courts, have also declined to import federal standards into the tribal context wholesale.

When analyzing due process claims, it is important to note that the Indian nations have formulated their own notions of due process and equal protection in compliance with both aboriginal and modern tribal law. Indian tribes, whose legal traditions are rooted in more informal traditions and customs, are markedly different from English common law countries, upon which the United States' notions of due process are founded....

When entering the arena of due process in the context of an Indian tribe, courts should not simply rely on ideas of due process rooted in the Anglo–American system and then attempt to apply these concepts to tribal governments as if they were states or the federal government.

*Ponca Tribal Election Bd. v. Snake*, 1 Okla. Trib. 209, 230 (Ct. Ind.App.—Ponca Tribe 1988) (citations omitted); *see also Kinslow v.*

*Business Comm.*, 1 Okla. Trib. 174, 188–89 (Citizen Band Potawatomi 1988).

With such an admonishment in mind, we believe that ICRA should not be read to trigger the *Massiah* exclusionary rule based on proceedings in tribal courts. That rule assumes that criminal prosecutions are conducted in an adversarial system. However, "[u]ntil the middle of this century, few Indian tribes maintained any semblance of a formal court system. Offenses by one Indian against another were usually handled by social and religious pressure and not by formal judicial processes; emphasis was on restitution rather than punishment." *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 197, 98 S.Ct. 1011, 1015, 55 L.Ed.2d 209 (1978). The underlying premise of an adversarial system is simply absent throughout many of the tribes: "Tribal laws and procedures are often influenced by tribal custom and can differ greatly from our own.... Traditional tribal justice tends to be informal and consensual rather than adjudicative, and often emphasizes restitution rather than punishment." *Wheeler*, 435 U.S. at 331–32 & n. 34, 98 S.Ct. at 1090 & n. 34. Congress had testimony before it that many tribal courts do not even hire prosecutors, *see* Hearings at 139. The right to counsel created by ICRA should not be interpreted in a way that would cause considerable damage to such informal systems; therefore, we consider it highly unlikely that Congress wished that such systems be subject to an exclusionary rule that presumes the existence of an adversarial method of trying criminal cases.[4]

However, we need not rely on our own reconstruction of what the Ninetieth Congress would have intended, for that Congress in fact has spoken on the precise issue before us. About two months after the Ninetieth Congress enacted ICRA, it enacted the

---

**3.** Some courts have split the difference and have held that federal precedents are fully applicable under ICRA where the challenged policy does not reflect a long-standing tribal tradition. *See Randall v. Yakima Nation Tribal Court*, 841 F.2d 897, 901–02 (9th Cir.1988); *Howlett v. Salish & Kootenai Tribes*, 529 F.2d 233, 238 (9th Cir. 1976). However, this rule has been severely criticized in the tribal courts, which have questioned the ability of federal courts to judge in the first instance whether a particular tribal policy is

truly traditional. *See Ponca Tribal Election Bd. v. Snake*, 1 Okla. Trib. 209, 230 (Ct. Ind.App.— Ponca Tribe 1988).

**4.** Tellingly, neither S. 961 nor S. 1843 incorporated an amendment proposed before the subcommittee that would have explicitly provided for the suppression in the tribal courts of confessions obtained in violation of ICRA. Hearings at 224.

Omnibus Crime Control and Safe Streets Act of 1968, Pub.L. No. 90–351, 82 Stat. 210 (1968). Section 701(a) of that act, which is now codified as 18 U.S.C. § 3501, provides in relevant part:

> (a) In any criminal prosecution brought by the United States or by the District of Columbia, a confession ... shall be admissible in evidence if it is voluntarily given. . . .
>
> (b) The trial judge in determining the issue of voluntariness shall take into consideration all the circumstances surrounding the giving of the confession, including ... (4) whether or not such defendant had been advised prior to questioning of his right to the assistance of counsel; and (5) whether or not such defendant was without the assistance of counsel when questioned and when giving such confession.
>
> The presence or absence of any of the above-mentioned factors to be taken into consideration by the judge *need not be conclusive* on the issue of voluntariness of the confession.

(Emphasis added). We are therefore presented with two statutes enacted by the same Congress that speak to the same subject, and we are obliged to read the statutes *in pari materia. See Bryan v. Itasca County,* 426 U.S. 373, 386–87, 96 S.Ct. 2102, 2109–10, 48 L.Ed.2d 710 (1976). In the Omnibus Crime Control Act, Congress expressly rejected the blanket rule of inadmissibility urged by Doherty in this case.[5] It is inconceivable that the same Congress that intended to terminate the use of the *Massiah* rule in the federal courts would have intended that ICRA be interpreted to trigger the same rule based on proceedings in the tribal courts. Thus, the right to counsel afforded to Doherty under ICRA did not obligate tribal or federal authorities to refrain from questioning him in the absence of counsel.

**D. Because Doherty's Statutory Right to Counsel in the Tribal Court Did Not Require the Suppression of His Confession, His Sixth Amendment Right to Counsel Had Not Yet Attached with Respect to Questioning By Federal Agents**

We emphasize that our holding should not be read to mean that federal officials do not owe Native Americans the protections defined in the Bill of Rights. To the contrary, Native Americans are citizens of the United States, *see* 8 U.S.C. § 1401(b), and the rule that tribal governments are not constrained by the Bill of Rights or the Fourteenth Amendment "of course, does not relieve State and Federal governments of their obligations to individual Indians under these provisions." *Santa Clara Pueblo,* 436 U.S. at 56 n. 7, 98 S.Ct. at 1676 n. 7. Doherty's confession was properly admitted into evidence not because Agents Kleinpaste and Carrick were unconstrained by the Sixth Amendment, but because Doherty's Sixth Amendment right to counsel had not yet matured before he was indicted and arraigned on the federal charges.[6] The Sixth

---

**5.** In enacting Pub.L. No. 90–351, Congress intended directly to overrule the exclusionary rules of *Miranda* and its progeny under the Fifth Amendment and *Massiah* and its progeny under the Sixth Amendment. *See* Sara Sun Beale, *Rethinking Supervisory Power in Criminal Cases,* 84 COLUM. L.REV. 1433, 1454 n. 151 (1984); *see also* S.Rep. No. 1097, 90th Cong., 2d Sess. 40 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112, 2127. However, § 3501 has essentially been ignored by the federal courts when interpreting the scope of those exclusionary rules. In those cases in which the right to counsel is afforded directly by the Fifth and Sixth Amendments, the rule of admissibility under § 3501 may well be unconstitutional. *Cf. Davis v. United States,* 512 U.S. 452, 464, 114 S.Ct. 2350, 2357–58, 129 L.Ed.2d 362 (1994) (Scalia, J., concurring) (inviting government to rely on § 3501 in future cases so that meaning and constitutionality of that section may

be addressed). However, in the present case, we are not asked to consider the effect that the statute has on the federal courts' interpretations of the Constitution, but instead the effect that the statute has on the meaning of another statute, enacted contemporaneously.

**6.** The dissent claims that our holding would authorize federal agents to beat a confession out of a Native American defendant and then to turn that confession over to tribal authorities for use at trial. *See infra,* at 29. Nonsense. As to the federal agents, the deliberate coercion of a confession would certainly be a violation of the Fifth Amendment under clearly established law. *See White v. Texas,* 310 U.S. 530, 60 S.Ct. 1032, 84 L.Ed. 1342 (1940). Therefore, the defendant would have recourse in a suit against the agents in federal court to vindicate his constitutional right to avoid such coercion. *See Bivens v. Six*

Amendment right to counsel does not attach until the "initiation of adversary judicial proceedings," *United States v. Gouveia,* 467 U.S. 180, 187, 104 S.Ct. 2292, 2296, 81 L.Ed.2d 146 (1984), and before that right attaches, the mere existence of a statutory right to counsel—where the statute does not independently mandate the suppression of uncounseled confessions—does not trigger the application of *Massiah* and *Jackson.*

█ At the time of his confession, Doherty had appeared at a criminal proceeding at which he had a statutory, but not a constitutional, right to counsel. He was therefore in a posture identical to that of a defendant who has voluntarily confessed to governmental agents after an interstate extradition proceeding. The Sixth Amendment does not mandate a right to counsel in such proceedings, since "an extradition hearing has a modest function not involving the question of guilt or innocence." *Judd v. Vose,* 813 F.2d 494, 497 (1st Cir.1987). Nonetheless, most states provide for a statutory right to counsel. *See* Unif.Crim. Extradition Act § 10. Despite the existence of the statutory right, courts have uniformly held that the invocation of the right to counsel at an extradition hearing does not require the invalidation of a subsequent confession under *Jackson,* even where the defendant is being extradited on the same crime on which he is ultimately tried, and the confession is with respect to that crime. *See Chewning v. Rogerson,* 29 F.3d 418, 421 (8th Cir.1994); *Judd,* 813 F.2d at 497; *Caltagirone v. Grant,* 629 F.2d 739, 748 n. 19 (2d Cir.1980). Thus, where the Sixth Amendment right to counsel does not apply, which would require the suppression of an uncounseled confession, the mere existence of a statutory right to counsel is not interpreted to carry with it the *Jackson* effect of invalidating future confessions. Similarly, in the present case, Doherty voluntarily confessed his crimes, and his invocation of his limited statutory right to counsel in the

tribal court was of no constitutional import. We therefore hold that his confession was properly admitted into evidence.

The dissent appears to acknowledge that the Hannahville tribe was under no constitutional or statutory duty to appoint counsel to Doherty, or to ensure that he not be presented with the opportunity to confess his crime before he retained counsel. The dissent nonetheless concludes that Doherty's Sixth Amendment right to counsel, and its *Jackson* effect of requiring the suppression of uncounseled confessions, somehow attached at the time of Doherty's tribal court arraignment. The dissent apparently reasons as follows: (a) federal agents are constrained by the Sixth Amendment; (b) the Sixth Amendment attaches at the initiation of adversary proceedings; (c) an arraignment is an adversary proceeding, *see Gouveia,* 467 U.S. at 188, 104 S.Ct. at 2297; therefore (d) the uncounseled confession after the tribal court arraignment must be suppressed. Of course, we agree with the dissent's first two premises.

█ The problem with the dissent's reasoning arises in its third premise. It assumes wrongly that an arraignment in tribal court is precisely parallel, "jot-for-jot and case-by-case" to an arraignment in state or federal court. As our preceding discussion makes clear, it is inaccurate to describe tribal court proceedings as "adversary" in the sense that that word is used in *Gouveia.* Many confrontations between a suspect and the government can be described as adversary in the sense that the interests of the two are opposed; however, the Sixth Amendment right to counsel does not extend to all such confrontations, but only to those where the government has "solidified" its decision to become the suspect's legal opponent. *See Moran v. Burbine,* 475 U.S. 412, 431–32, 106 S.Ct. 1135, 1146–47, 89 L.Ed.2d 410 (1986). The federal and state courts assume a prosecutorial system of criminal justice, and therefore it is uncontroversial that an arraignment

*Unknown Named Agents of Fed. Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). As to the tribal court, ICRA's prohibition of compelled self-incrimination, 25 U.S.C. § 1302(4), would bar the admission of a truly involuntary confession in a tribal court, even if ICRA does not require the tribal courts to adopt

the same legal presumptions of involuntariness as are followed in the federal and state courts. In addition, as separate sovereigns, the tribes are of course free to adopt any exclusionary rule that they deem to be appropriate under their own laws.

in those courts constitutes the initiation of adversary proceedings.

In the tribal courts, in contrast, there is a far greater emphasis on cooperative resolution of legal disputes, and many tribes eschew the prosecutorial and adversarial model of criminal justice. *See* Hearings at 139.[7] Since the Hannahville tribe, like any foreign sovereign not bound by the Bill of Rights, is under no duty to treat its version of an arraignment as an adversary proceeding, it simply defies logic to conclude that the Sixth Amendment right to counsel attaches at that time. The flaw in the dissent's reasoning is demonstrated further by the fact that the tribe was not required to appoint counsel to Doherty if he lacked the means to retain one. Under the dissent's logic, if Doherty did not retain counsel, government agents would have been precluded from *ever* questioning him after he told the tribal court that his mother would try to find an attorney.[8] This cannot be, and is not, the law.

In sum, at the time of his questioning by the federal agents, Doherty's confession was voluntary for the purposes of the Fifth Amendment, despite the fact that he was in custody at that time. Furthermore, his confession was not involuntary under the Sixth Amendment, since his right to counsel had not attached in an "adversary proceeding." Therefore, his confession was properly admitted into evidence in his federal prosecution.

### IV

The judgment of the district court is AFFIRMED.

MERRITT, Circuit Judge, concurring in part and dissenting in part.

I concur in the majority's holdings in sections II and III.A of its opinion that the Fifth Amendment does not require suppression of Doherty's confession and that the offense-specific nature of the Sixth Amendment right

to counsel does not bar application of that Amendment under the circumstances of this case. Unlike the majority, however, I would find that even though the Sixth Amendment does not apply to Indian tribes, the Sixth Amendment right to counsel does apply to the federal government and restricts the actions of federal law enforcement agents following arraignment in a tribal criminal prosecution. Doherty's tribal court arraignment was an adversary criminal judicial proceeding that triggered the Sixth Amendment right to counsel with respect to the federal government. Since federal law enforcement agents initiated questioning without counsel present after Doherty's Sixth Amendment right attached and he had requested counsel, the resulting confession should be suppressed.

\* \* \*

The sole Sixth Amendment issue in this case is whether or not the Sixth Amendment right to counsel attaches against the federal government at the time of an Indian tribal court arraignment. Curiously, the majority opinion fails to address this issue directly. In sections III.B and III.C of its opinion, the majority concludes, respectively, (i) that the Sixth Amendment does not apply to questioning by tribal officials and (ii) that, as a matter of statutory interpretation, the Indian Civil Rights Act does not require tribal courts to suppress confessions obtained by tribal officials in violation of that Act. Apparently based on these premises, the majority concludes in section III.D of its opinion that the Sixth Amendment right to counsel did not attach with respect to the *federal* government at the time of Doherty's tribal court arraignment. That conclusion, however, does not follow from the majority's premises and is incorrect.

Sections III.B and III.C of the majority's opinion address a factual situation that is not before this court: introduction in a tribal court proceeding of a confession obtained by

---

7. This emphasis on cooperation was demonstrated in Doherty's own arraignment; after his arraignment was continued, the tribal court, tribal authorities, and Doherty (without counsel) negotiated a solution to the question of temporary custody of his step-children.

8. It should be noted that the record does not reflect that Doherty ever did retain counsel at any point prior to his indictment on the federal charges.

Indian tribal officials. The case actually before us involves introduction in a federal criminal proceeding of a confession obtained by federal law enforcement agents. The majority opinion fails to analyze this scenario, and provides no support, either logical or precedential, for the ultimate conclusion that it draws from its irrelevant premises.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." The plain language of the Amendment bars the federal government from infringing defendants' right to counsel "[i]n all criminal prosecutions"— including tribal prosecutions. This right to counsel attaches "at . . . the initiation of adversary judicial criminal proceedings— whether by way of formal charge, preliminary hearing, indictment, information, *or arraignment." United States v. Gouveia,* 467 U.S. 180, 188, 104 S.Ct. 2292, 2297, 81 L.Ed.2d 146 (1984) (quoting *Kirby v. Illinois,* 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972) (plurality opinion)) (emphasis added). Federal agents initiated questioning after Doherty had been arraigned in tribal court and had requested counsel at that proceeding. That questioning violated the Sixth Amendment.

The question of whether or not the Sixth Amendment right to counsel constrains tribal officials has no bearing on this appeal. Although the Supreme Court found in *Talton v. Mayes,* 163 U.S. 376, 16 S.Ct. 986, 41 L.Ed. 196 (1896), that the Fifth Amendment does not constrain Indian tribes, that opinion predates the doctrine of "selective incorporation." Under that doctrine, the Court has held that selected provisions of the Bill of Rights—including the Sixth Amendment right to counsel—are included within the Fourteenth Amendment concept of Due Process and thus constrain state governments. *See, e.g., Gideon v. Wainwright,* 372 U.S. 335, 343–45, 83 S.Ct. 792, 796–97, 9 L.Ed.2d 799 (1963). Neither the Supreme Court nor this Court has ruled whether or not the doctrine of selective incorporation makes provisions of the Bill of Rights applicable to Indian tribes. *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978) involved a challenge brought under the Fourteenth Amendment's Equal Protection Clause and did not directly address the selective incorporation question.

Whether or not selective incorporation applies to Indian tribes, there is no question that the Sixth Amendment constrains the actions of federal law enforcement officers. "The line of authority growing out of *Talton,* while exempting Indian tribes from constitutional provisions addressed specifically to State or Federal Governments, of course, does not relieve State and Federal Governments of their obligations to individual Indians under these provisions." *Santa Clara Pueblo,* 436 U.S. at 56 n. 7, 98 S.Ct. at 1676 n. 7; *see also Duro v. Reina,* 495 U.S. 676, 692, 110 S.Ct. 2053, 2063, 109 L.Ed.2d 693 (1990) ("Indians like other citizens are embraced within our Nation's great solicitude that its citizens be protected . . . from unwarranted intrusions on their personal liberty." (citation and internal quotation marks omitted)).

The Indian Civil Rights Act is also irrelevant to the determination of this case. The question of constitutional interpretation that we face is independent of any statutory construction. As the majority notes in the final paragraph of its opinion, when the Sixth Amendment right to counsel has not attached, no statute can alter that fact. By the same token, once the Sixth Amendment right to counsel has attached, no statute can eviscerate that right. The constitutional issue in this case is thus unaffected by whether or not the Indian Civil Rights Act requires Indian tribes to apply the exclusionary rule and would remain the same even if Congress were to amend or even repeal that Act. Although I have serious concerns about the majority's interpretation of the Indian Civil Rights Act, that portion of the majority opinion is clearly dicta and therefore requires no further response here.

The majority's reliance on extradition hearing cases is also misplaced. All of the extradition cases that the majority cites hold that extradition hearings are not adversarial judicial proceedings that trigger the Sixth Amendment. Doherty, however, was *arraigned* prior to the questioning at issue— which clearly triggers the Sixth Amendment. *See, e.g., Gouveia, supra.* The extradition hearing cases demonstrate that a statutory right to counsel has no bearing on whether

or not there is a constitutional right to counsel. These cases further demonstrate the irrelevance of the majority's discussion of the Indian Civil Rights Act.

The essence of the majority's holding is that the Bill of Rights does not constrain the behavior of federal officials interceding in Indian tribal proceedings. That holding invites flagrant federal abuse of Indian criminal defendants. Under the majority's holding, for example, there would be no constitutional violation if federal agents beat a confession out of an Indian defendant and then turned over the confession to tribal prosecutors. That interpretation of the Constitution is simply incorrect. Moreover, although not relevant to the constitutional issue, it is worth noting that such behavior by federal agents, at least if performed on their own initiative rather than at the request of a tribe, would also appear not to violate the Indian Civil Rights Act. That Act provides only that "[n]o *Indian tribe* in exercising powers of self-government shall [infringe various rights]." 25 U.S.C. § 1302 (emphasis added).

For all of the foregoing reasons, I would find that Doherty was questioned in violation of his Sixth Amendment right to counsel and that the resulting confession must be suppressed. I therefore dissent from the majority's contrary holding.