2000 D.S.D. 52

**UNITED STATES of America,
Plaintiff,**

v.

**Gerald SWIFT HAWK, Defendant.**

**No. CR 00–30061.**

United States District Court,
D. South Dakota,
Central Division.

Dec. 11, 2000.

Jay P. Miller, U.S. Attorney's Office, Pierre, South Dakota, for plaintiffs.

Edward G. Albright, Federal Public Defender's Office, Pierre, South Dakota, for defendants.

## ORDER

KORNMANN, District Judge.

[¶ 1.] This is a case involving the charge of operating a motor vehicle under the influence of alcohol in Indian Country. As I have stated previously in other cases, I did not realize, prior to taking office as an Article III judge, that I would be presiding over drunk driving cases. The allegation in the present case is also that a minor, i.e. a person less than 18 years of age, the son of the defendant, Gerald Swift Hawk ("Swift Hawk"), sustained serious bodily injury as a result of Swift Hawk driving under the influence. What is the bottom line if these allegations are true? Congress has seen fit to impose altogether different penalties on Native Americans driving under the influence in Indian Country as compared with those who drive under the influence elsewhere. Thus, a person of German or Norwegian descent

driving under the influence in Aberdeen, SD, would not face nearly the same penalties as a Native American driving on one of the reservations in South Dakota. Why Congress would have done this is beyond me. There is apparently a never ending trail of Congress making almost everything a federal crime. The vast majority of members of Congress apparently give no thought to what they are doing to Native Americans who are then made subject to these federal crimes, carrying penalties out of all proportion to penalties found outside Indian Country. The vast majority of members of Congress come from states where Indian Country does not exist. Principles of federalism are no longer given sufficient consideration. Chief Justice Rehnquist has pointed this out several times in recent years. Pursuant to 18 U.S.C. § 13(b)(2)(A), Native Americans driving under the influence in Indian Country as well as impaired drivers on Ellsworth Air Force Base and other federal enclaves face not only the "normal punishment" in South Dakota but also the punishment "shall include an additional term of imprisonment of not more than 1 year, or if serious bodily injury of a minor is caused, not more than 5 years, or if death of a minor is caused, not more than 10 years, and an additional fine . . ." Thus, Swift Hawk faces up to five years more time in prison and a much higher fine than a similarly situated Norwegian or, for that matter, another Native American driving in Sioux Falls. This is without taking into account the terrible harshness of the Federal Sentencing Guidelines in their treatment of Native Americans. Again, I do not understand the logic of any of this. It is, if nothing else, unfair and discriminatory. It is certainly not "equal justice under law." But it is the law and my job is to follow constitutional laws as enacted by Congress.

[¶ 2.] Swift Hawk filed a motion to suppress certain statements (Doc. 31), a motion to suppress blood-alcohol evidence (Doc. 33), and a supplemental motion (Doc. 47) as to both of the previous motions.

U.S. Magistrate Judge Moreno, after conducting an evidentiary hearing, filed and served a report and recommendations for disposition of Swift Hawk's motions (Doc. 54) and a supplement to the report and recommendations (Doc. 56). Judge Moreno also stated his detailed findings, conclusions and recommendations in open court in the presence of the parties and their attorneys and this is part of the record (Doc. 55). I have conducted a *de novo* review of the transcript of the evidentiary hearing (Doc. 46), the record made in open court (Doc. 55) and all the files and records herein, including, of course, all the responses filed by the government. Swift Hawk filed and served objections (Doc. 59) to the recommendations of the magistrate; the objections have been considered. The government filed and served objections (Doc. 60) to the magistrate's report and recommendations; such objections have also been considered.

[¶ 3.] The federal "implied consent law" is found at 18 U.S.C. § 3118. The implied consent for a blood test does not come into existence unless the driver has first been arrested for any offense arising from such person having operated a motor vehicle in the special maritime or territorial jurisdiction of the United States. This is the first question to be answered. As to the second question, the statute further provides that the test is to be administered if the officer had "reasonable grounds to believe the person arrested" had been operating the motor vehicle while under the influence of drugs or alcohol "in violation of the laws of a State, territory, possession, or district." Swift Hawk could not have violated, as such, South Dakota laws since state laws, in general, have no application in Indian Country. The statute is not particularly well written. The parties have not addressed what is a "territory, possession, or district." It is clear that no reference is made to Indian Country, i.e. the special territorial jurisdiction of the United States, in the last sentence of the 18 U.S.C. § 3118(a).

■ [¶ 4.] Turning to the first question to be answered, it is clear that the tribal criminal investigator, Grace Her Many Horses, did not know whether Swift Hawk had been arrested before she ordered his blood to be drawn at the hospital. The testimony of tribal officer Murray was very confusing and, in places, plainly contradictory as to the sequence involving the arrival of Her Many Horses (obviously before the drawing of the blood) and the arrest of Swift Hawk. Judge Moreno heard the testimony and saw the witnesses. There is clear support and testimony to the effect that the defendant was under arrest and the blood was then drawn, meeting the requirements of the statute, and I so find. It is, as a matter of law, immaterial that Her Many Horses, in seeking to have the blood drawn, did not know that officer Murray had previously arrested Swift Hawk.

[¶ 5.] Turning to the second question, it makes no difference whether implied consent might have existed if, in fact, Swift Hawk actually voluntarily consented to have his blood drawn and tested. The testimony of Her Many Horses is not consistent. The first implication of her testimony was that she simply told Swift Hawk she was taking his blood. The leading question asked was: "You asked him if he would consent to a blood sample?" She did not say "yes." She answered: "I just told him that I was going to be taking his blood." Later and in response to a number of questions, she testified that Swift Hawk was told that the officer "needed to get a sample of his blood and he agreed to it." Swift Hawk did not attempt to rebut this in his testimony. Again, Judge Moreno heard the testimony and observed the witnesses. He found that consent was given and this Court will not reverse that finding but will adopt it. It is clear that the tribal investigator did not explain to Swift Hawk the implied consent law, either as it works in South Dakota (SDCL 32–23–10) or as the federal statute provides. Swift Hawk was given no form to sign to consent to the drawing of his blood and no form

explaining the implied consent law. The tribal investigator failed to follow proper procedures for any officer seeking to have blood drawn from a person suspected of having been driving under the influence.

■ [¶ 6.] Swift Hawk was, as indicated, arrested on tribal charges which were essentially the same as the later federal charge filed. He appeared in tribal court with counsel, the tribal public defenders' office, for his arraignment. The arraignment was completed and he was released on bond. After all this had occurred, an F.B.I. agent and the tribal investigator, Her Many Horses, interviewed Swift Hawk at his home and took a statement from him. This conduct is very troubling. To his credit, as previously urged by this Court on many occasions, the F.B.I. agent tape recorded the statement. The statement is not part of the record at this time but, at least in this case, we will not have to decide who said what and what adjectives were used. Both the agent and Her Many Horses knew that Swift Hawk had already made a tribal court appearance on the D.U.I. charge, i.e. that he had been arraigned and formally charged. Her Many Horses knew that counsel would have been appointed for him in tribal court (as is always done in Rosebud) and, since the charges were still pending, that his lawyer would still have been acting as counsel for Swift Hawk. This Court takes judicial notice that, in civil cases, investigators and especially attorneys do not question a person they know to be represented by counsel without the attorney's consent and knowledge. Having practiced law for thirty years, primarily as a trial attorney representing a large number of insurance companies as well as plaintiffs, I know that all reputable insurance companies and adjusters in the United States have adopted this policy and have reduced it to writing. It would obviously be highly unethical for any attorney to talk to or even attempt to talk with another party when the attorney knows that party is represented by counsel. It is simply not "fair play" to "go

around" the attorney, even when the represented party agrees to talk without the presence of his attorney. Swift Hawk was not told that he had the right to have his attorney present when he was being questioned. He was not asked whether he wanted his attorney present. No permission was sought or received from his attorney to interview him. He was given only the "Griffin" rights and not the Miranda rights. Swift Hawk had not made his first appearance in federal court on this charge and had not even been indicted. He was clearly not in custody on any charge and had been released on bond in connection with the tribal charges. There is no Sixth Amendment right to counsel in Indian Country as to tribal court matters although such right is guaranteed by the Indian Civil Rights Act ("ICRA") (but only at the expense of the defendant). Congress, in adopting the ICRA, obviously made the decision that Native Americans would not be entitled to the same protections extended to every other American, namely the right to appointed counsel in criminal cases, at public expense, if necessary. In the absence of tribal funds being used, federal funds would have been required to accomplish that and Congress has not seen fit to even adequately fund tribal courts. The Tribal Constitution of the Rosebud Sioux Tribe grants more rights than granted by the ICRA, namely the right to counsel at public expense; the Tribe has a public defenders' office to provide representation at the expense of the tribe.

[¶ 7.] No claim is made by Swift Hawk as to any violation of his rights under the Fifth Amendment.

[¶ 8.] There is almost no case law on the ICRA. There is one case and the parties both discuss *U.S. v. Doherty,* 126 F.3d 769 (6th Cir.1997). Doherty had made his first appearance in tribal court but the tribal court arraignment had been continued to allow time for him to employ an attorney. He had not actually spoken with any attorney and the record did not reflect whether his mother had actually obtained an attorney when he was interviewed by the F.B.I. He, unlike Swift Hawk, had no "tribal right" to an attorney. Doherty was in custody and, before being interviewed, was given the standard "advice of rights form" to read and sign, this constituting the well known Miranda warnings. He read and signed the form. Swift Hawk was given no such information and no written form. The agent, unlike the agent in the present case, read the advice of rights form "line by line with Doherty, pausing after each line to ascertain that Doherty understood his rights, including the right to remain silent, the right to have a lawyer present during questioning, and the right to stop speaking and to request a lawyer at any time during the interview. Significantly, Agent Kleinpaste also explained to Doherty that, while he had no such right in the tribal court, he had the right to have a lawyer appointed for him at government expense for the purposes of the interview. Doherty signed a waiver form indicating that he elected voluntarily to proceed with the interview." *Doherty* at 772–73. "Agent Kleinpaste informed Doherty at the beginning of the interview that he had the right to have an appointed attorney present during the interview, and asked him whether he had an attorney in the tribal court. Doherty responded that he did not, but that his mother was going to retain one. Agent Kleinpaste testified that Doherty understood that; while he did not have the right to an appointed attorney in tribal court, he did have such a right for the purposes of the interview." *Id.* at 773. Again, of course, it must be remembered that we are not dealing with Fifth Amendment questions. We are dealing only with questions under the Sixth Amendment. I obviously recognize that Doherty was given Miranda rights because he was in custody.

[¶ 9.] In the case of Swift Hawk, the tribal and the federal charges are virtually identical. They are "inextricably intertwined." It is undisputed that both the

federal government and the tribe, two sovereigns, were cooperating in the investigation and charging of the defendant. The two sovereigns "worked in tandem" in connection with these "drunk driving" charges.

[¶ 10.] The Sixth Amendment does not apply of its own force to Indian tribes. *Talton v. Mayes,* 163 U.S. 376, 16 S.Ct. 986, 41 L.Ed. 196 (1896) (although dealing with the question of whether cases in tribal court could be prosecuted without an indictment by a grand jury). It is clear as well that there is no Fourteenth Amendment for Indian tribes. They did not participate in the Constitutional Convention and did not "sign on" by joining the federal union.

[¶ 11.] The Sixth Amendment requires the suppression of any confession "which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel." *Massiah v. United States,* 377 U.S. 201, 204, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). In relying on *Massiah,* the United States Supreme Court has held that "if police initiate interrogation after a defendant's assertion, at an arraignment or similar proceeding, of his right to counsel, any waiver of the defendant's right to counsel for that police-initiated interrogation is invalid." *Michigan v. Jackson,* 475 U.S. 625, 636, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986). I concede that the majority in *Doherty* may have been correct in determining that the ICRA does not "trigger the *Massiah* exclusionary rule based on proceedings in tribal courts." *Doherty* at 781. This Court, however, respectfully disagrees with the statements in *Doherty* that tribal court proceedings are informal and not adversarial and that Congress did not wish to impose on such systems "an exclusionary rule that presumes the existence of an adversarial method of trying criminal cases." *Doherty* at 780. I have no information as to how a tribal court serving a total tribal membership of 300 people works in the Upper Peninsular of Michi-

gan. I do have knowledge how tribal courts dealing with thousands of Native Americans work in South Dakota. I am also aware that federal courts are obligated to extend respect and act with principles of comity toward tribal courts. I decline to jump to the assumptions or conclusions expressed in *Doherty* that tribal courts operate as something of a family gathering and counseling session. The description of the tribal court in *Doherty* sounds, very frankly, like a description of "teen courts" now in vogue in various high schools. That is not the way tribal courts work in South Dakota and it is clear that, at least in the present case, adversarial judicial proceedings had been initiated. Swift Hawk, unlike Doherty, had more than "the mere existence of a statutory right to counsel ..." *Doherty* at 782. The *Doherty* reliance on comparing tribal court proceedings to extradition proceedings is misplaced in the context of Swift Hawk since " 'an extradition hearing has a modest function not involving the question of guilt or innocence.' *Judd v. Vose,* 813 F.2d 494, 497 (1st Cir.1987)." *Id.* Extradition proceedings are not akin to prosecutions in tribal court in South Dakota and there is no evidence to even suggest that. Nor is there any evidence or argument to suggest that tribal court criminal prosecutions in South Dakota are not adversarial proceedings. They are adversarial. They are especially so given the impact that tribal convictions can have under the Federal Sentencing Guidelines which impact so unfairly on Native American criminal defendants.

[¶ 12.] We need not, however, necessarily rely on the ICRA in this case and the question becomes: is the *Massiah* exclusionary rule triggered by a tribal constitution guaranteeing the right to appointed counsel and by the fact that Swift Hawk had actually been arraigned in an adversarial proceeding in tribal court and had counsel appointed and acting for him, all before he was questioned in the absence of

his attorney? The answer, this Court believes, is in the affirmative.

[¶ 13.] This Court also believes that the views of Judge Merritt, Circuit Judge, dissenting in *Doherty* at 783, are the better views of the law. This Court agrees with Judge Merritt that federal agents are indeed constrained by the Sixth Amendment, that the Sixth Amendment attaches at the initiation of adversary proceedings, and that an uncounseled confession (dealing with basically the same offense conduct) after the adversarial tribal court arraignment and appointment of counsel must be suppressed.

[¶ 14.] All of the foregoing aside, the Court, at the trial of this matter, would not permit the F.B.I. interview and confession or statement to go to the jury. It would be excluded under Fed.R.Evid. 403. Its probative value would be substantially outweighed by the danger of unfair prejudice, given all that has occurred in this case. It would also be excluded because of waste of time and needless presentation of cumulative evidence. Swift Hawk has admitted to others that he was driving and such evidence is not being suppressed. Swift Hawk was asked by officer Murray on the highway at the accident scene as to "who" was driving. He was not asked: "were you the driver?" He was not in custody and his answer that he was the driver was voluntarily given. There were other passengers in the vehicle who would know very well who was driving.

[¶ 15.] The government concedes, and properly so, that the statement made by Swift Hawk to Her Many Horses at the hospital on June 21, 2000, a statement taken after he had been arrested and without any Miranda warning, should be suppressed and it will be suppressed, at least as to the government's case in chief. It remains to be seen whether Swift Hawk will testify at trial. If he does, *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), may permit the use of the statement; the Court will answer that question at that time.

[¶ 16.] It is difficult to understand why law enforcement officers cannot or will not follow proper procedures. This investigation of a motor vehicle accident has been tainted by too many errors, especially by tribal police officers. The right hand did not know what the left hand was doing. The Court wonders what training is being provided to these officers. Are there no procedures spelled out for officers to follow in making an arrest of a drinking driver, especially one who has been involved in an apparently serious accident? Drunk driving is a very serious problem everywhere. It is even more of a problem on Rosebud. The end, however, does not justify the means and it should not be difficult for law enforcement officers to learn what rights American citizens have and to respect those rights.

[¶ 17.] The jury will not be instructed on the South Dakota statutory presumptions as to the effect of the level of alcohol found in the blood. *See* SDCL 32–23–7. No witness and no attorney will make any reference to such statute or to the contents of the statute. There is no federal presumption of any kind. It is not necessary to decide in this case whether the federal implied consent statute permits a suspect to refuse to be tested. Trial courts have gone both ways on that question. *See U.S. v. Sauls*, 981 F.Supp. 909 (D.Md., 1997), and *United States v. Rogers*, 926 F.Supp. 1000 (D.Colo.1996). Again, the statute is not clearly written. 18 U.S.C. § 3118(a) certainly reads to the effect that the driver has consented. 18 U.S.C. § 3118(b) may indicate that the driver may revoke his implied consent and spells out the consequences of such refusal. It is clear that, if the officer has reasonable grounds to believe that the person was driving while under the influence, the individual may be reasonably compelled to submit to a chemical test. *See South Dakota v. Neville*, 459 U.S. 553, 103 S.Ct. 916, 74 L.Ed.2d 748 (1983), and *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). In this case, Swift Hawk was not

told anything about his rights, under either the federal statute or the state statute. This Court agrees with the analysis of Judge Moreno in which he relied on the reasoning in *U.S. v. Sauls,* supra, as to the statutory presumptions. The statutory presumptions in South Dakota are rules of evidence. SDCL 32–23–7 is not a statute simply specifying procedures. It is a very important rule of evidence in certain cases. The statute does not apply in this federal case. It does not come in under the Assimilative Crimes Act. The presumptions will not be grafted on to the federal statute, especially given what has happened in this case. Fed.R.Evid. 403 is applicable here as well.

[¶ 18.] The government, in its objections (Doc. 60), asks for "clarification" as to whether, if it may not use the statutory presumptions, it may call experts to testify as to the effects of a blood alcohol count of 0.256 by weight. The government suggests that the magistrate recommended that any such expert testimony should also be excluded. The Court sees nothing to that effect in Doc. 55. Instead, the magistrate stated: "Instead that will have to be something that the jury will have to determine based on the blood-alcohol results and any other evidence that you offer in support of your view that he was in fact under the influence at the time." In any event, the Court declines to enter an advisory opinion. The testimony will be subject to *Daubert.* There has been no motion in limine to prevent any such evidence. There has been no claim by Swift Hawk that any such expert testimony would not meet the requirements of *Daubert.* Evidence in the way of expert testimony as to the effects of alcohol in the blood is quite common in cases in which alcohol is involved. The results of the blood test will be admitted into evidence. Swift Hawk may desire to have expert assistance of his own as to the meaning or lack thereof of a blood alcohol count of 0.256.

[¶ 19.] The other objections by Swift Hawk simply have no support in the law. The magistrate judge correctly analyzed such objections and the applicable law and this Court agrees.

[¶ 20.] The objection to the recommendation and report as to the joint statements to the F.B.I. agent and the tribal investigator should be sustained. All other objections should be overruled, the motions denied and the report and recommendations accepted. The objections of the government should be denied.

[¶ 21.] Now, therefore, IT IS ORDERED, as follows:

1) The motion to suppress certain statements (Doc. 31) and the supplemental motion covering the same subject matter (Doc. 47) is granted as to the statements to Her Many Horses and to the joint statements to the F.B.I. agent and Her Many Horses and is otherwise denied.

2) The motion to suppress blood-alcohol evidence (Doc. 33) and the supplemental motion covering the same subject matter (Doc. 47) is granted as to the statutory presumption evidence and is otherwise denied.

3) The objections of Swift Hawk (Doc. 59) to the report and recommendations are sustained as to the joint statements to the F.B.I. agent and Her Many Horses and are otherwise overruled.

4) The objections of the government (Doc. 60) are overruled.

5) The report and recommendations of the magistrate judge (Docs. 54 and 56) are rejected as to the joint statements to the F.B.I. agent and Her Many Horses and such statements will not be admitted. The report and recommendations are otherwise adopted.

6) The oral report and recommendations (Doc. 55) are rejected as to the joint statements to the F.B.I. agent and Her Many Horses but are otherwise adopted.