# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-1078

_____

United States of America,         *
                                  *

        Appellee,         *

                                  *

    v.                     *

                                  *

Annette Marie Canania,        *

                                  *

        Appellant.       *

_____

No. 07-1329

_____

Appeals from the United States
District Court for the
Eastern District of Missouri.

United States of America,         *
                                  *

        Appellee,         *

                                  *

    v.                     *

                                  *

Gerald Robinson,        *

                                  *

        Appellant.       *

_____

Submitted: November 15, 2007
Filed: July 14, 2008 (Corrected: 07/30/2008)

_____

Before MELLOY, BRIGHT, and SHEPHERD, Circuit Judges.
_____

SHEPHERD, Circuit Judge.

Annette Marie Canania and Gerald Robinson were convicted of one count of conspiracy to possess pseudoephedrine knowing it would be used to manufacture methamphetamine and two counts of possession of pseudoephedrine knowing it would be used to manufacture methamphetamine, pursuant to 21 U.S.C. § 841(c)(2). The district court[1] sentenced Canania and Robinson to 240 and 220 months imprisonment, respectively. From their sentences, they appeal. Their cases are now consolidated on appeal. We affirm.

I.

In December of 2003, officers with the St. Louis County Multi-Jurisdictional Drug Task Force obtained consent to search the residence of Julie Friend. Therein, the officers found methamphetamine and numerous items related to the use and manufacture of methamphetamine. Friend became an informant for the officers and provided them information about the involvement of Canania and Robinson in the sale and manufacture of methamphetamine. Friend was a "shopper" for Canania. A "shopper" is a person who obtains precursors, such as: cold tablets from which pseudoephedrine could be derived; lithium batteries; fish tank hoses; windshield washer solvent; and Heet.[2] Wearing a hidden recording device, Friend delivered some

_____

[1]The Honorable E. Richard Webber, United States District Judge for the Eastern District of Missouri.

[2]Heet is the brand name of a fuel additive which is designed for use as a gas-line antifreeze and water remover. It is also commonly used in the manufacture of methamphetamine.

pseudoephedrine pills to Canania. Law enforcement officers observed Friend enter Canania and Robinson's residence at 2230 Hood Street, St. Louis, Missouri, with the pills and exit without the pills. Based upon this investigation, the officers sought and obtained a search warrant for the Hood Street home.

When officers executed the search warrant, they seized: cold tablets; lithium batteries; fire extinguishers; an oxygen tank from which the valves had been removed (which can be used to manufacture anhydrous ammonia); 1.5 grams of methamphetamine; sandwich bags; glass jars; snorting tubes; a bottle of pure ephedrine; a smoking pipe; coffee filters (hidden in the air ducts); cotton swabs; paint thinner; windshield wiper fluid; .22 caliber ammunition; and a .22 caliber pistol. The pistol was seized from the bedroom shared by Canania and Robinson. At the time of the seizure, Robinson was asleep on the same bed where the pistol was found. During the search, the officers also noticed that there was fire damage throughout the basement.

Despite the fact that many of the above listed items were seized from the kitchen counters and from on top of the bed in their bedroom, Canania and Robinson denied any knowledge of the items seized from their home. They suggested that previous tenants must have left the items. Likewise, they denied any involvement in causing the fire damage in the basement of the home.

Approximately two months later, on February 17, 2004, law enforcement officers observed Ronald Hartge purchase two boxes of cold medicine under suspicious circumstances. They followed Hartge from the store, and he agreed to cooperate with them when he realized they were following him. Hartge consented to a search of his vehicle and his residence, and he admitted that he previously had attempted to manufacture methamphetamine but was not successful. As part of his agreement to cooperate with law enforcement, Hartge identified residences which he

knew to have a connection to the sale or manufacture of methamphetamine. While doing so, he pointed out the home of Canania and Robinson as a place methamphetamine was manufactured or sold. Hartge agreed to be wired with a hidden recording device and went to the home of Canania and Robinson. While at the home and while being recorded, Hartge agreed to bring Canania and Robinson cold pills to be used to manufacture methamphetamine. Hartge later returned to the residence and delivered the requested cold pills to Canania and Robinson. Hartge also purchased methamphetamine from Canania and Robinson. Officers then obtained and executed a second search warrant for the Hood Street home of Canania and Robinson. During the execution of the search warrant, the officers found and seized methamphetamine, cold pills, and other substances used to manufacture methamphetamine. Canania and Robinson denied any knowledge of these items, just as they had following the first search.

In January of 2006, Canania and Robinson were indicted for methamphetamine-related offenses, and warrants were issued for their arrest. When officers attempted to serve the arrest warrants, they discovered that Canania and Robinson no longer lived at the Hood Street residence. In February of 2006, law enforcement officers with the St. Louis County Multi-Jurisdictional Drug Task Force learned that Heather Thompson, a confidential informant for another law enforcement agency, knew Robinson and could deliver cold pills to him for use in the manufacture of methamphetamine. By then, Robinson was again living at 2230 Hood Street. However, he was sharing the residence with a man named Lee Westfall, not Canania. On February 13, 2006, Thompson made a controlled delivery of cold tablets to the 2230 Hood Street residence while wearing a hidden recording device. Just prior to Thompson's entry into the residence, Robinson was observed entering the residence with a briefcase. When Thompson entered the residence, Westfall indicated to Thompson that Robinson was inside the house, but Thompson did not see Robinson. Westfall gave Thompson a gram of methamphetamine in exchange for 10 boxes containing 48 cold tablets in each box.

Immediately thereafter, a third search warrant was obtained and executed on the home. Once again, methamphetamine, cold pills and other paraphernalia were seized from the residence. Specifically, officers seized: a notepad containing a crude formula for "ice," which is the base form of methamphetamine; an unloaded shotgun found beside the bed; a digital scale inside a wallet, along with coffee filters and one of Robinson's business cards; powder residue on the scale; the ten boxes of cold tablets taken to the residence by Thompson just prior to the execution of the search warrant; other cold tablets; empty cold pill boxes; a jar of blue pill binder; Heet; a bottle of lye; 0.99 grams of methamphetamine packaged for sale in three plastic bags which were located inside Robinson's briefcase; iodine; camp fuel; an acid generator; and a fire extinguisher. Additionally, the officers noted red stains in the basement believed to be caused from the production of iodine crystals, which are necessary to the manufacture of methamphetamine.

Following their arrests, Canania and Robinson were indicted and tried for one count of conspiracy to possess pseudoephedrine knowing it would be used to manufacture methamphetamine, three counts of possession of pseudoephedrine knowing it would be used to manufacture methamphetamine, and one count of possession of a firearm in furtherance of a drug-trafficking offense. At trial, the testimony of Friend, Hartge, and Westfall, as well as the evidence obtained during the three searches was introduced. The jury convicted Canania and Robinson of one count of conspiracy to possess pseudoephedrine knowing it would be used to manufacture methamphetamine and two counts of possession of pseudoephedrine knowing it would be used to manufacture methamphetamine. The jury acquitted the pair of the firearms charge and of the third count of possession of pseudoephedrine knowing it would be used to manufacture methamphetamine.

Friend, Hartge, and Westfall, who had charges pending, were sentenced after the trial of Canania and Robinson, but prior to the sentencing hearing of Canania and

Robinson. On September 27, 2006, Hartge was sentenced to four years probation. On November 15, 2006, Westfall was sentenced to 80 months in prison. On November 16, 2006, Friend was sentenced to four years probation.

On December 14, 2006, the district court conducted the sentencing hearing of Canania and Robinson. With regard to the Guideline range adopted by the district court, Canania objected to the two-level firearm enhancement, the three-level role in offense enhancement and the denial of the two-level reduction for acceptance of responsibility. Her objections were overruled. Canania's Guideline range was 262 to 327 months with a maximum statutory term of 60 years (720 months). Canania was sentenced to 240 months imprisonment and three years of supervised release. The district court sentenced Canania below the Guideline range, noting that it wanted to avoid disparity between Canania and Robinson's sentences, as well as giving consideration to Canania's history of being a victim of abuse and her long history of drug addiction.

The district court conducted Robinson's sentencing hearing on the same date and calculated Robinson's Guidelines range to be 188 to 235 months imprisonment. Robinson objected to the quantity of methamphetamine attributed to him and the two-level enhancement for firearm possession. His objections were also overruled. Robinson then sought a downward variance from the Guidelines range arguing that: he and Canania manufactured the methamphetamine to feed their own addictions and they made very little money; he was an otherwise law-abiding citizen who worked hard as a carpenter; he was 59 years old; he had arthritis; and, due to his age and arthritis, he would be particularly vulnerable to abuse in prison. The court declined to sentence Robinson below the Guideline range and imposed a sentence of 220 months in prison and two years supervised release. From their sentences, Canania and Robinson appeal.

II.

On appeal, Canania argues that the district court erred in: (1) imposing a two-level firearms enhancement pursuant to the 2005 United States Sentencing Commission, Guidelines Manual, § 2D1.1(b)(1); (2) applying a three-level enhancement for her supervisory role pursuant to USSG § 3B1.1(b); (3) denying her request for a two level reduction for acceptance of responsibility pursuant to USSG § 3E1.1(a); and (4) imposing an unreasonable sentence. Robinson argues that the district court erred in the following ways: (1) imposing the two-level firearm enhancement pursuant to USSG § 2D1.1(b)(1); (2) refusing to grant his request for a downward variance because he was not given a leadership role enhancement, resulting in an unreasonable sentence; (3) failing to properly weigh the factors pertaining to the nature and circumstance of the offense in refusing to grant his request for a downward variance, resulting in an unreasonable sentence; and (4) failing to consider or give appropriate weight to relevant factors such as his age, disability and disparity in sentence among co-conspirators in refusing to grant his request for a downward variance, resulting in an unreasonable sentence.

III.

"We review a district court's interpretation and application of the Guidelines de novo and its factual findings regarding enhancements for clear error." United States v. Gillispie, 487 F.3d 1158, 1162 (8th Cir. 2007). See United States v. Gall, 128 S. Ct. 586, 587 (2007) (improper calculation of Guidelines range is procedural error).

We do not find that the trial court clearly erred in determining that the pistol hidden in the bed shared by Canania and Robinson was connected to the drug offenses of which they were convicted. If it is "not 'clearly improbable that the [pistol] was connected with the [drug offenses,]'" then the district court did not clearly err in

-7-

giving the defendants the two-level increase in offense level pursuant to Guidelines section 2D1.1. United States v. Bell, 477 F.3d 607, 614 (8th Cir. 2007); accord United States v. Peroceski, No. 07-1336, 2008 WL 819082, at *3 (8th Cir. Mar. 28, 2008) (clarifying that government bears burden of proving defendant is subject to sentencing enhancement by establishing it is not clearly improbable that firearm was connected to drug offense). Firearms serve as the 'tools of the drug trade' by 'providing protection and intimidation,' therefore firearms and drug offenses are often related and "result in reciprocal offense characteristic enhancements." Id. at 615 (quoting United States v. Linson, 276 F.3d 1017, 1019 (8th Cir. 2002)). The testimony established that the .22 caliber pistol was well within the reach of a person lying in the bed and drug paraphernalia was scattered all over the bed at the time the gun was seized. Both Canania and Robinson lived in the residence, slept in the bed where the gun was located, and participated in the possession of the paraphernalia and precursors, as well as the manufacture and sale of methamphetamine. Canania and Robinson were both aware of the presence of the gun in the bedroom. Hence, they were both in possession of the firearm.

Robinson's brother testified that he gave Robinson the gun several years before it was seized in order for Robinson to "reblue" the gun. However, there were no rebluing materials in the house, and a firearms expert testified that the gun did not need to be reblued because the gun's finish was in excellent condition. While it is well settled that the "mere presence of a firearm cannot support the enhancement," the district court should apply the enhancement unless it is "clearly improbable that the weapon was connected with the offense." Gillispie, 487 F.3d at 1162 (citing USSG § 2D1.1, comment n. 3.).

We cannot say that it was clearly improbable that the pistol in this case was connected with the drug operation. This is especially true in light of the proximity of the paraphernalia and drugs to the gun, the condition of the gun's finish and the absence of rebluing materials in the house. Much of the evidence of manufacture of

methamphetamine was seized from the same room as the gun, and drugs and drug paraphernalia were found on the very bed where the gun was located. Methamphetamine manufacturing items found on the bed included: denatured alcohol; pseudoephedrine pills; a glass vile containing powder; a box of "Bronch-eze," an ephedrine-like substance; a mason jar; a Pyrex dish with residue on it; a dish containing a lithium battery; boxes of antihistamines and decongestants; syringes; marijuana; the 599 pseudoephedrine pills delivered by Julie Friend; and another 479 pseudoephedrine pills. Next to the bed, officers found: a glass vile containing methamphetamine; additional pseudoephedrine pills; a smoking pipe; cotton swabs; paint thinner; and windshield wiper fluid.

To determine that a gun was connected to the drug activity, the district court may find a temporal and spatial relationship between the defendants, the criminal activity, and the firearm. United States v. Newton, 184 F.3d 955, 958 (8th Cir. 1999). The government established such a relationship between Canania and Robinson, their drug activities, and the firearm located in their bedroom. We also note that the jury's acquittal of Canania and Robinson of the firearms charge does not preclude the district court from applying the section 2D1.1(b)(1) two-level enhancement. United States v. Eberspacher, 936 F.2d 387, 389 (8th Cir. 1991). We find that the trial court did not err when it applied the Guidelines section 2D1.1 firearm enhancement to Canania and Robinson.

IV.

Canania next argues that the district court erred in imposing a three-level enhancement for her supervisory role in the conspiracy pursuant to section 3B1.1(b), which provides that when a defendant "was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants, or was otherwise extensive," the offense level should be increased by three levels.

USSG § 3B1.1(b). We review the district court's decision to apply an upward adjustment in the offense level pursuant to USSG § 3B1.1 for clear error. United States v. Mata-Peres, 478 F.3d 875, 877 (8th Cir. 2007).

We cannot find that the district court clearly erred in determining that Canania had a managerial or supervisory role in the conspiracy. Canania does not dispute that the conspiracy involved more than five people. Further, Canania was the person who ran the business aspect of the conspiracy, while Robinson was the "cook." Canania recruited the co-conspirators to obtain the cold pills and other items to be used to manufacture the methamphetamine. She then continued to cultivate relationships with the co-conspirators. Canania determined the amount of methamphetamine each co-conspirator would receive in exchange for his or her procurement of cold pills and other precursors. After she bargained with the co-conspirators, Canania then did all the prep work on the cold pills to ready them for the final methamphetamine "cook".

While Canania tended to the business end of the operation during the day, Robinson worked at his regular job as a carpenter. When Robinson arrived home from work, Canania would give him the prepped pseudoephedrine pills and then Robinson would take the prepped pills to another location to "cook" the methamphetamine. When the "cook" was complete, Robinson returned to their home with the final product. Canania then determined how much methamphetamine they could keep for their own use, how much they would sell and how much was to be used to pay the people who procured the cold pills for use in the manufacture of the methamphetamine. Based on the evidence, the district court did not clearly err by imposing the three-level enhancement to Canania's offense level based on its finding Canania played a managerial or supervisory role in this operation. See United States v. Zimma, 299 F.3d 710, 724 (8th Cir. 2002) (Evidence suggested managerial or supervisory role enhancement where defendant assisted in cooking methamphetamine, directed procurement of significant amount of ephedrine pills, and taught others how to set up methamphetamine lab).

V.

Canania next argues that the district court erred in denying her request for a two-level decrease in her offense level based on acceptance of responsibility pursuant to Guidelines section 3E1.1. We review a denial of a reduction for acceptance of responsibility for clear error on the part of the district court. United States v. Johnson, 474 F.3d 515, 521 (8th Cir. 2007). The burden was on Canania to show that she "clearly demonstrated" acceptance of responsibility under section 3E1.1. United States v. Spurlock, 495 F.3d 1011, 1014 (8th Cir.), cert. denied, 128 S. Ct. 687 (2007). "The Guidelines suggest several factors a district court may consider in deciding whether to grant an acceptance of responsibility reduction including: (1) whether the defendant truthfully admitted the conduct comprising [her] offense; (2) whether [s]he voluntarily surrendered to authorities promptly after the commission of the offense; and (3) the timeliness of [her] conduct manifesting acceptance of responsibility." Johnson, 474 F.3d at 521 (citing USSG § 3E1.1 comment. (n.1)).

A district court's factual determination of the defendant's entitlement to an offense level decrease for acceptance of responsibility is "entitled to great deference, and we will reverse it only if it is so clearly erroneous as to be without foundation." Spurlock, 495 F.3d at 1014. The two-level decrease for acceptance of responsibility is not intended to be applied when a defendant puts the United States to its burden of proof at trial by denying the essential factual elements of guilt, then expresses remorse upon conviction at jury trial. USSG § 3E1.1 comment. (n. 2). Canania argues that she should have been given the two-level decrease because her attorney told the jury in opening statements that the only charges she denied involvement in were the firearm charge and witness tampering charge. Even a plea of guilty is no guarantee of a reduction for acceptance of responsibility. See United States v. Miller, 951 F.2d 164, 165 (8th Cir. 1991) (guilty plea did not guarantee reduction for acceptance of responsibility; district court properly denied reduction despite defendant's professed regret). At sentencing, the government submitted a written list to the district court

-11-

that documented all the ways Canania tried to minimize or deny her involvement in the offenses prior to her sentencing, all of which were disproved in the course of the trial. Despite the fact that the drug paraphernalia was located on her kitchen countertops, in her bedroom, and on top of her bed, Canania stated that she had no idea where the drug paraphernalia in her home came from and suggested to law enforcement that it must have been left there by previous tenants. The testimony of co-conspirators was sufficient to establish that Canania was not only aware of the presence of the drug paraphernalia in her home, she was running the methamphetamine manufacturing operation and participating in the preparation of cold pills for use in the manufacture of methamphetamine. Although she denied involvement in all counts until her attorney conceded her involvement in the drug charges at trial, it was only after her conviction that she admitted some of her illegal conduct. We cannot say that the district court clearly erred in denying Canania a reduction for acceptance of responsibility.

VI.

Canania and Robinson argue that their sentences were unreasonable for a variety of reasons. We review the reasonableness of the district court's sentences for abuse of discretion. Gall, 128 S. Ct. at 597 ("Assuming that the district court's sentencing decision is procedurally sound, the appellate court should then consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard."). The United States Supreme Court determined that the Guidelines are advisory, United States v. Booker, 543 U.S. 220, 245 (2005), but should serve as the "starting point" for the district court's sentence. Kimbrough v. United States, 128 S. Ct. 558, 574 (2007) (quoting Gall, 128 S. Ct. at 596). In reviewing the sentences of Canania and Robinson, we determine whether the district court's sentencing decision was reasonable considering the totality of the circumstances. United States v. Gillmore, 497 F.3d 853, 858 (8th Cir. 2007), cert. denied, 128 S. Ct. 921 (2008).

Further, a sentence below or within the Guidelines range is presumptively reasonable on appeal. Id.

Canania argues that the 240 month sentence imposed upon her by the district court was unreasonable in light of: (1) the sentences of her coconspirators and codefendants; (2) her lack of prior criminal history; (3) her psychiatric problems; and (4) the abuse she suffered as a child . However, we find no abuse of discretion in the district court's sentencing determination. The district court concluded that Canania's culpability and role in the offense was greater than that of Robinson, who received a sentence within his Guidelines range, and Friend and Hartge, both of whom pled guilty and cooperated with the government both during the investigation and at trial. Further, the district court in fact did afford Canania a downward variance and sentenced her to a below-Guidelines sentence, in an effort to somewhat equalize her sentence with that of Robinson, whose culpability most closely resembled her own. We find that the district court properly considered the section 3553(a) factors, including: the nature and circumstances of the offense; the history and characteristics of the defendant; and the need to avoid unwarranted sentencing disparities among defendants with similar records and conduct.

Robinson also argues that the district court imposed an unreasonable sentence in his case and erred in refusing to grant a downward variance from his Guidelines sentence. Robinson's 220 month sentence was within the Guidelines range of 188 to 235 months imprisonment. Specifically, Robinson argues that because he was not given a leadership role enhancement, the district court erred in considering his role as a factor in denying his request for a downward variance. Such consideration fits squarely within the 18 U.S.C. § 3553(a)(1) factor of "nature and circumstances of the offense" and is appropriate. See United States v. Wills, 476 F.3d 103, 110 (2d Cir. 2007) ("18 U.S.C. § 3553(a)(1) provides a natural and necessary basis for placing the actions of an individual defendant in the broader context of the crime he or she committed [and] requires consideration of the 'nature and circumstances of the

offense'"). The district court stated that, because Robinson was not given an offense level increase for his role in the offense, it would decline to grant a downward variance from his Guidelines sentence. We cannot say that the district court abused its discretion in making such a determination in applying the section 3553(a)(1) factor of the nature and circumstances of the offense.

Additionally, Robinson argues that the district court should not have considered his drug addiction and the impact of his actions on other people in denying his request for a downward variance. The evidence considered by the district court established that: all the women associated with this case lost custody of their children as a result of their involvement with methamphetamine; Robinson provided methamphetamine to his coworkers prior to their departure to the job sites and throughout the work day, resulting in a dangerous work environment; and a fire resulted in the basement of the home he shared with Canania due to cooking methamphetamine. Although Robinson argues that the record does not support his long use of drugs, his argument conflicts with the admissions he made to the probation officer during his presentence report interview. Robinson reported using marijuana at a young age and using methamphetamine for several years prior to his arrest. We do not find that the district court erred in considering the section 3553(a)(1) factors of Robinson's history and characteristics.

Like Canania, Robinson also argues that the district court should have granted a downward variance because of the sentences received by his codefendants and coconspirators. However, Robinson overlooks the distinctions the district court noted between his conduct and that of the cooperating witnesses who testified against him. Friend and Hartge received probation after: providing information as confidential informants; wearing hidden recording devices to assist the government in obtaining evidence of criminal conduct; admitting their involvement very early on; and providing substantial assistance by testifying at trial. "Disparity in sentences between a defendant who provided substantial assistance and one who provided no assistance,

. . . is not 'unwarranted.'" United States v. Gallegos, 480 F.3d 856, 859 (8th Cir. 2007). Westfall only joined the conspiracy after the first two search warrants were executed, but he did not act as a confidential informant. There is no evidence of his involvement prior to the indictment of Canania and Robinson. Westfall received an 80 month sentence. Comparatively, Westfall was a minor participant in the conspiracy. See United States v. Plaza, 471 F.3d 876, 880 (8th Cir. 2006) (district court not required to impose identical sentences on both defendants when there is a disparity in participation and history). Further, Canania, who was considered to have a supervisory role, received a greater sentence than Robinson. Therefore, Robinson's argument that the district court failed to consider the section 3553(a)(6) factor of unwarranted sentence disparities fails because the conduct and records of the codefendants and coconspirators are not sufficiently similar to that of Robinson to trigger a finding of an unreasonably disparate sentence. Id.

Robinson also argues that he should be granted a downward variance based on his age and disability. At sentencing, Robinson urged the district court to grant him a downward variance from the Guidelines range of 188 to 235 months to a term of imprisonment of 78 months. In support of his request for a downward variance, Robinson argued the following factors: (1) he is 59 years old; (2) he has been a law-abiding citizen for the past 35 years; (3) he was a hard worker with little education or training; (4) he broke his back 25 years ago and has arthritis, but still works as a carpenter and roofer; (5) his intelligence and mental condition; and (6) his vulnerability in prison. When we review a defendant's sentence to determine whether it is unreasonable with regard to the application of 18 U.S.C. § 3553(a), we apply a "deferential abuse-of-discretion standard." Gall, 128 S. Ct. at 591. We give "due deference" to the decision of the district court that the section 3553(a) factors justify and support the degree of any variance from the Guidelines range. United States v. Lehmann, 513 F.3d 805 (8th Cir. 2008) (citing Gall, 128 S. Ct. at 597)

The record does not establish that Robinson's age, past or present physical or psychological health, or his intelligence make him particularly vulnerable in a prison environment. Robinson failed to establish that he suffered from any extraordinary physical or mental impairment. Through the date of Robinson's arrest, he was actively engaged in physical labor through his work as a carpenter, and the evidence does not establish a sudden decline in his physical abilities or mental health condition after his arrest. Likewise, prior to his arrest, he was engaged in the chemical manufacture of methamphetamine, which requires at least a basic understanding of certain chemical reactions and belies his professed intellectual insufficiency. While the facts would have supported an upward departure, the district court declined to apply an upward departure for Robinson's supervisory role as the "cook" of the conspiracy. Indeed, the district court considered all the above factors, including its leniency in declining to impose an upward departure, in denying Robinson's request for a downward variance. Based on the totality of the circumstances and the district court's stated justifications, we do not find that the district court abused its discretion in denying Robinson's request for a downward variance. See Lehmann, 513 F.3d at 808 (post Gall, we now examine substantive reasonableness of sentence by considering "totality of the circumstances" and strength of stated justification, reviewing district court's decision for abuse of discretion).

VII.

Accordingly, we affirm the judgment of the district court.

_____

BRIGHT, Circuit Judge, concurring.

Bound by Supreme Court and Circuit precedent, I reluctantly concur with my colleagues in affirming Canania's and Robinson's convictions and sentences. I write

-16-

separately to express my strongly held view that the consideration of "acquitted conduct" to enhance a defendant's sentence is unconstitutional.

In this case, the jury acquitted both Canania and Robinson of possessing a firearm in furtherance of a drug-trafficking conviction. Nevertheless, at sentencing, the district court judge enhanced both of their sentences pursuant to U.S.S.G. § 2D1.1(b)(1) for "possessing" a firearm in connection with a drug offense because it was not "clearly improbable that the weapon was connected [to their] offense[s]." United States v. Gillispie, 487 F.3d 1158, 1162 (8th Cir. 2007) (citing U.S.S.G. § 2D1.1(b)(1), cmt. n.3). And so, under the guise of "judicial discretion," we have a sentencing regime that allows the Government to try its case not once but twice. The first time before a jury; the second before a judge.

Before the jury, the Government must prove its case beyond a reasonable doubt. But if it loses on some counts, that matters little. Free of the Federal Rules of Evidence, most constitutionally-imposed procedures, and the burden of proving any critical facts beyond a reasonable doubt, the Government gets the proverbial "second bite at the apple" during sentencing to essentially retry those counts on which it lost. With this second chance at success, the Government almost always wins by needing only to prove its (lost) case to a judge by a preponderance of the evidence. See McMillan v. Pennsylvania, 477 U.S. 79, 91-92 (1986) (due process generally satisfied when Government proves a sentencing enhancement by a preponderance of the evidence). Permitting a judge to impose a sentence that reflects conduct the jury expressly disavowed through a finding of 'not guilty' amounts to more than mere second-guessing of the jury – it entirely trivializes its principal fact-finding function. But no less significant, this judicial fact-finding deprives a defendant of adequate notice as to his or her possible sentence. This state of affairs is unfair, unjust and I believe plain unconstitutional. Though the Government might have "won" everyone and everything else – the defendant, the jury system, the Constitution – loses.

-17-

In the last decade, the Supreme Court re-affirmed the jury's central role in the criminal justice system. See, e.g., Apprendi v. New Jersey, 530 U.S. 466 (2000); Ring v. Arizona, 536 U.S. 584 (2002); Blakely v. Washington, 542 U.S. 296 (2004); United States v. Booker, 543 U.S. 220 (2005). Rather than pretending as if these cases were never decided, we federal judges should acknowledge their clear implication: A judge violates a defendant's Sixth Amendment rights by making findings of fact that either ignore or countermand those made by the jury and then relies on these factual findings to enhance the defendant's sentence. Cf. United States v. Mercado, 474 F.3d 654, 658 (9th Cir. 2007) (Fletcher, B., J., dissenting) ("Reliance on acquitted conduct in sentencing diminishes the jury's role and dramatically undermines the protections enshrined in the Sixth Amendment."); United States v. Faust, 456 F.3d 1342, 1349 (11th Cir. 2006) (Barkett, J., specially concurring) ("I strongly believe . . . that sentence enhancements based on acquitted conduct are unconstitutional under the Sixth Amendment, as well as the Due Process Clause of the Fifth Amendment."); United States v. Ibanga, 454 F. Supp. 2d 532, 536 (E.D. Va. 2006) (Kelley, J.) ("Sentencing a defendant to time in prison for a crime that the jury found he did not commit is a Kafka-esque result.") (footnote omitted), vacated by, 2008 U.S. App. LEXIS 6980 (4th Cir. Apr. 1, 2008); United States v. Pimental, 367 F. Supp. 2d 143, 153 (D. Mass. 2005) (Gertner, J.) ("To tout the importance of the jury in deciding facts, even traditional sentencing facts, and then to ignore the fruits of its efforts makes no sense – as a matter of law or logic.").

I also believe that the use of "acquitted conduct" to enhance a sentence violates the Due Process Clause of the Fifth Amendment. As I noted above, the consideration of "acquitted conduct" undermines the notice requirement that is at the heart of any criminal proceeding. A defendant should have fair notice to know the precise effect a jury's verdict will have on his punishment. It cannot possibly satisfy due process to permit the nullification of a jury's not guilty verdict, with respect to any given charge, by allowing a judge to thereafter use the *same* conduct underlying that charge to enhance a defendant's sentence. It is not unreasonable for a defendant to expect

that conduct underlying a charge of which he's been acquitted to play no determinative role in his sentencing. Otherwise, a defendant can never reasonably know what his possible punishment will be. In determining guilt or innocence, the jury thus serves not only as a fact-finder but as a means of providing a defendant with notice as to his possible punishment. And a judge's subsequent use of "acquitted conduct" all but eviscerates this latter notice function.

In short, the unfairness perpetuated by the use of "acquitted conduct" at sentencing in federal district courts is uniquely malevolent. The rationale offered is that judges who consider "acquitted conduct" at sentencing are doing so merely as part of exercising their constitutionally-sanctioned sentencing discretion. But that explanation merely obfuscates the reality in which federal district court judges are often acting as automatons – mechanically enhancing sentences with "acquitted conduct" pursuant to the now "advisory" Sentencing Guidelines.

And so, in effect, the Guidelines, with respect to "acquitted conduct," remain very much mandatory. Neither the Fifth nor Sixth Amendments should tolerate such a practice. But it is not this mechanical adherence to the Guidelines which makes unconstitutional the use of "acquitted conduct" to enhance a defendant's sentence. That practice is best understood as an artifact of nearly twenty years of mandatory sentencing guidelines. In my view, the Constitution forbids judges–Guidelines or no Guidelines–from using "acquitted conduct" to enhance a defendant's sentence because it violates his or her due process right to notice and usurps the jury's Sixth Amendment fact-finding role.

Because I believe the inclusion of "acquitted conduct" to fashion a sentence is unconstitutional, I urge the Supreme Court to re-examine its continued use forthwith. Absent its intervention, I fear the courts of appeals will again refuse to recognize the full import of Apprendi and its progeny. Cf. Gall v. United States, 128 S. Ct. 586

(2007) (reversing the court of appeals for failing to follow <u>Booker</u>'s command to give significant deference to the sentencing decisions of district court judges).[3] And as a consequence, defendants will continue to receive unfair punishments for years to come.

The federal courts are just emerging from their experience with mandatory Guidelines – a failed experiment – that for nearly twenty years resulted in an untold number of defendants receiving excessive and unfair sentences, that we now know were unconstitutional. By continuing to permit federal judges to consider "acquitted conduct" at sentencing, we needlessly repeat our mistake of wrongly depriving individuals of their freedom. I wonder what the man on the street might say about this practice of allowing a prosecutor and judge to say that a jury verdict of 'not guilty' for practical purposes may not mean a thing.[4]

---

[3]I should note that the Sixth Circuit recently heard *en banc* arguments in <u>United States v. White</u> (05-6596) on the constitutionality of enhancing sentences with "acquitted conduct."

[4]What might the man on the street think? Recently, the *Washington Times* reported that federal prosecutors have asked for a sentence of 40 years in the case of Antwuan Ball (<u>United States v. Antwuan Ball</u> (05-CR-IOO(1)-RWR D.D.C.)), the purported leader of a large criminal conspiracy in Washington, D.C., despite the fact that a jury had acquitted him of *every* charge except a $600, half-ounce, hand-to-hand crack cocaine deal seven years ago. <u>See</u> Jim McElhatton, *A $600 drug deal, 40 years in prison; Acquitted of murder, convicted of drug deal, Antwuan Ball faces a decades-long sentence*, WASHINGTON TIMES, June 29, 2008 (<u>available at</u>: http://www.washingtontimes.com/news/2008/jun/29/a-600-drug-deal-40-years-in-prison/?page=1 (last accessed July 3, 2008)). The article notes that the prosecutors' request is based "partly on charges that were never filed or conduct the jury either rejected outright or was never asked to consider." <u>Id.</u> After learning of the prosecutors' request, one of the jurors, a retired economist at the U.S. Department of Agriculture, who had served about eight months on the Ball jury, wrote U.S. District Judge Richard W. Roberts as follows:

It seems to me a tragedy that one is asked to serve on a jury, serves, but then finds their work may not be given the credit it deserves. We, the jury, all took our charge seriously. We virtually gave up our private lives to devote our time to the cause of justice, and it is a very noble cause as you know, sir. We looked across the table at one another in respect and in sympathy. We listened, we thought, we argued, we got mad and left the room, we broke, we rested that charge until tomorrow, we went on. Eventually, through every hour-long tape of a single drug sale, hundreds of pages of transcripts, ballistics evidence, and photos, we delivered to you our verdicts.

What does it say to our contribution as jurors when we see our verdicts, in my personal view, not given their proper weight. It appears to me that these defendants are being sentenced not on the charges for which they have been found guilty but on the charges for which the District Attorney's office would have liked them to have been found guilty. Had they shown us hard evidence, that might have been the outcome, but that was not the case. That is how you instructed your jury in this case to perform and for good reason.

May 16, 2008 Letter from Juror #6 to The Honorable Richard W. Roberts, <u>available at</u>: http://video1.washintontimes.com/video/docs/letter.pdf (last accessed July 3, 2008).

And this was a comment from someone who was more than just the man on the street.