BRIGHT, Circuit Judge,
dissenting.
I dissent.[2]
I write to protest the sentencing disparity in this case and the heavy disparity in sentences for other similarly-situated individuals based purely on their race and residence.[3] Appellant-defendant' Gordon Lasley (Lasley), an Indian[4] and twenty-six-years old at the time of sentencing, will spend the rest of his life in prison for a conviction of two counts of second-degree murder, but a sentence imposed as though the conviction was for two counts of first-degree murder. This result comes about because our precedent: (1) purports to allow the imposition of the federal sentencing regime to cases under the Major Crimes Act, 18 U.S.C. § 1153 without consideration of sentences imposed and actual time served for similar state-law crimes; and (2) authorizes federal district courts to find a defendant committed a greater offense for the purpose of sentencing when a jury expressly convicts a defendant of the lesser-included offense. The consequence of both precedents is a high probability Lasley will serve a longer sentence than a white citizen because Lasley is an Indian who committed a crime in Indian Country. This disparity resting on Lasley’s status as an Indian is unjust, unfair, and improper for the reasons set forth herein. Thus, Lasley’s sentence should be reversed and remanded.
I.
The first legal infirmity presented in this case relates to the application of the U.S. Sentencing Guidelines (Guidelines) to cases brought under the Major Crimes Act without consideration of sentences and time served for similar state-law crimes. The federal courts’ method of sentencing individuals under the Major Crimes Act creates documented disparities in sentences and, as such, Indians often receive higher sentences purely because of their status as an Indian in Indian Country. Such disparities are analogous to disparities in equal rights for African Americans before and since Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). In light of documented disparities, like the legal shift after Brown, the law regarding the sentencing of individuals under the Major Crimes Act and the Guidelines must change to avoid harsh computation of punishments based purely *916 on an individual’s status as an Indian in Indian Country.
A. The Major Crimes Act and Applications of the Guidelines
The Major Crimes Act creates federal jurisdiction over certain enumerated crimes,[5] including murder, committed by Indians in Indian Country. Kills Crow v. United States, 451 F.2d 323, 324 (8th Cir. 1971). Jurisdiction over the types of crimes enumerated in the Major Crimes Act would generally lie with the state or tribal governments. Native American Advisory Group, Report 1 (2003) [hereinafter NAAG Report], available at http://www.ussc.gov/ sites/default/fíles/pdf/research-and-publieations/research-projects-and-surveys/miscellaneous/20031104_Native_ American_Advisory_Group_Report.pdf. Congress enacted the Major Crimes Act “to insure equal treatment for Indian and non-Indian offenders who commit certain offenses in Indian country.” United States v. Norquay, 905 F.2d 1157, 1163 (8th Cir. 1990) (emphasis added) (quoting H.R. Rep. No. 94-1038 (1976), reprinted in 1976 U.S.C.C.A.N. 1125).
In 1990, Congress also applied the Guidelines to the Major Crimes Act. Crime Control Act of 1990, Pub. L. No. 101-647, § 1602, 104 Stat. 4789 (1990). Prior to that time, some “federal judges tried to take into account Indians’ different culture and the distinct societal background presented by the tribes” when imposing sentences under the Major Crimes Act. Jon M. Sands, Departure Reform and Indian Crimes: Reading the Commission’s Staff Paper with Reservations, 9 Fed. Sent’g Rep. 144, 144 (1996). By applying the Guidelines to Major Crimes Act cases, Congress directed district courts to sentence individuals purely under the Guidelines even when the crime was one traditionally prosecuted under state or tribal law. Documented sentencing disparities for Indians committing crimes in Indian Country are the consequence of Congress’ directions relating to the application of the Guidelines to the Major Crimes Act.
B. Disparities Created by Application of the Guidelines
Concerns surrounding Congress’ decision to apply the Guidelines to the Major Crimes Act are not new. Prior to the application of the Guidelines, many articulated concern that Indian defendants would be treated more harshly under the Guidelines than individuals prosecuted for similar offenses in their respective states. See Tribal Issues Advisory Group, Report 17 & n.16 (2016) [hereinafter TIAG Report] (citing Tova Indriz, Testimony before U.S. Sentencing Comm’n (Nov. 5, 1986); Letter from Frederic F. Kay, Fed. Pub. Def., Dist. of Ariz., to Hon. William W. Wilkins, Chair, U.S. Sentencing Comm’n (Aug. 9, 1989)), available at http://www.ussc.gov/ research/research-publieations/report-tribal-issues-advisory-group.
Unfortunately, Congress ignored the concerns regarding the likelihood of disparity.[6] As a consequence, Indian defendants, like Lasley, prosecuted under the Major Crimes Act often receive much *917 harsher sentences and serve longer terms of imprisonment than individuals convicted of similar state-law crimes. Information regarding this sentencing disparity can be gleaned from a number of sources.
First, judges have observed sentencing disparities for individual Indians prosecuted under the Major Crimes Act. For exam- • pie, this judge’s first experience with this disparity and obvious prejudice to a defendant came during consideration of United States v. Deegan, 605 F.3d 625 (8th Cir.), rh’g denied, 634 F.3d 428 (8th Cir. 2010), and cert. denied, 563 U.S. 938, 131 S.Ct. 2094, 179 L.Ed.2d 896 (2011).[7] The government prosecuted Deegan, an Indian woman and mother of three young daughters, for a crime in Indian Country within the State of North Dakota. Id. at 627. Deegan committed a type of homicide rarely considered in federal court called neonaticide. Id. at 642-45 (Bright, J., dissenting). Namely, Deegan suffered terrible abuse throughout her life and, in desperation likely stemming from years of abuse, Dee-gan gave birth to a child in her home and permitted the newborn to die shortly after birth. Id.
A grand jury returned a federal indictment charging Deegan with first-degree murder. Id. at 628 (majority opinion). Dee-gan entered into a written plea agreement and pled guilty to one count of second-degree murder. Id. The district court calculated Deegan’s Guideline range at 121 to 151 months’ (approximately 10 to 15]k years’) imprisonment. Id. The district court then sentenced Deegan to more than ten years’ imprisonment (121 months) without considering similarly situated defendants in the State of North Dakota. Id. at 656-58 (Bright, J., dissenting).
What was startling about the Deegan case was the contrast between Deegan’s more than ten-year term of imprisonment compared to other North Dakota women who similarly committed the crime of neo-naticide. Around the same time Deegan committed her offense, a young student in Fargo, North Dakota permitted her newborn to die within twenty-four hours after birth. BJ Jones & Christopher J. Ironroad, Addressing Sentencing Disparities for Tribal Citizens in the Dakotas, 89 N.D. L. Rev. 53, 71 (2013). The. student was prosecuted in state court and received a sentence of three-years’ probation with time suspended. Id. (citing North Dakota v. N.D. State Univ. Student, No. 09-00-K-01202-1, slip op. (N.D. Dist. Ct. 2000)). A few years later, a Bismarck, North Dakota woman drowned her newborn soon after birth. Id. The woman was prosecuted in state court and received a sentence of two-years’ imprisonment with time suspended. Id. at 72 (citing North Dakota v. Glum, No. 08-07-K-02741, slip op. (N.D. Dist. Ct. 2007)). More recently, another North Dakota woman committed neonaticide by drowning her newborn. The woman was sentenced in state court to one-year imprisonment with time suspended. Bryce Martin, Lindstrom to Serve No Jail Time, Gets Suspended Sentence, Bowman County Pioneer, June 14, 2014.
The comparison between Deegan’s sentence of more than ten years’ imprisonment and the sentences imposed upon these other North Dakota women for a similar crime is staggering. Deegan’s sentence is eighty percent longer than the most stringent sentence .imposed under North Dakota law and the North Dakota defendants served little-to-no time in jail.
Deegan’s case serves as a graphic example of the disparity that exists because of the application of the Guidelines to Major Crimes Act cases without consideration of *918 similar state-law sentences. More examples of this disparity exist around the country. See, e.g., United States v. Swift Hawk, 125 F.Supp.2d 384, 384-85 (D.S.D. 2000) (“[A] person of German or Norwegian descent driving under the influence in Aberdeen, SD, would not face nearly the same penalties as a Native American driving on one of the reservations in South Dakota. Why Congress would have done this is beyond me.”). And federal prosecutors and defenders hear and express concerns that Indians are sentenced more harshly under federal law. TIAG Report at 19 & n.21.
Scholarly research provides a second source of information regarding the disparity in sentences for Indians convicted under the Major Crimes Act. Many legal scholars have researched and observed sentencing disparities in Major Crimes Act cases. Some scholarly articles on this topic include: Jones & Ironroad, supra, at 68-72; Lindsey Trainor Golden, Note, Embracing Tribal Sovereignty to Eliminate Criminal Jurisdiction Chaos, 45 U. Mich. J.L. Reform 1039, 1061-64 (2012); Emily Tredeau, Comment, Tribal Control in Federal Sentencing, 99 Cal. L. Rev. 1409, 1416-17 (2011); Timothy J. Droske, Correcting Native American Sentencing Disparity Post-Booker, 91 Marq. L. Rev. 723, 728-46 (2008); Gregory D. Smith, Comment, Disparate Impact of the Federal Sentencing Guidelines on Indians in Indian Country, 27 Hamline L. Rev. 483, 509-22 (2004); Nora V. Demleitner, First Peoples, First Principles: The Sentencing Commission’s Obligation to Reject False Images of Criminal Offenders, 87 Iowa L. Rev. 563, 574-79 (2002); Sands, supra, at 144-47.
A third body of evidence documenting this disparity comes from advisory groups formed by the U.S. Sentencing Commission (Commission). In 2002, the Commission formed the Native American Advisory Group (NAAG) to research whether disparate sentences were imposed under the Major Crimes Act. NAAG Report at 10. NAAG issued a report concluding that a disparity gap existed for many Indians prosecuted under federal law. Id. at 19-25, 30-33. NAAG asked the Commission to take certain actions to diminish the sentencing impact on Indian defendants convicted under the Major Crimes Act, id. at 39, but the Commission failed to take any action in response to the NAAG Report, Jones & Ironroad, supra, at 67-68.
More recently, the Commission formed the Tribal Issues Advisory Group (TIAG) which issued its report in May 2016. TIAG Report at 18. In its report, TIAG found that “many Native Americans, federal prosecutors, federal defenders, and some federal and state judges ... believe that Indians receive different sentences than do non-Indians who commit the same or similar crimes.” Id. at 19. TIAG concluded that “[rjegardless of the existence of supporting statistics, widespread perceptions of unfair sentencing merit serious discussion” because “ ‘[pjerceived improper racial disparity fosters disrespect for and lack of confidence in the criminal justice system.’ ” Id. at 20 (quoting Diana E. Murphy et al., U.S. Sentencing Comm’n, Cocaine and Federal Sentencing Policy 103 (2002)). TIAG further opined that data “hint[ed] at disparity and underscore] the need for more targeted information.” Id. at 21-24.
Ultimately, however, TIAG concluded that “data limitations ... prevent a systematic and comprehensive exploration” into the “[d]ifferences in sentencing arising from the different ways federal and state law treat the same crime.” Id. at 21. TIAG recommended the Commission take steps to collect this information because, absent reliable data collection, the Commission is unable to provide “a federal criminal justice system that is free of unintentional *919 sentencing disparities toward Native Americans.” Id. at 28-29.
In light of the wealth of evidence that disparities in sentences exist for Indians convicted under the Major Crime's Act, action must be taken to ensure all defendants receive fair sentences. However, while TIAG’s recommendation to seek more data on this issue is well taken, the TIAG Report merely scratches the surface for a resolution to this unfair and prejudicial system. It is, therefore, incumbent upon the federal courts to reduce these disparities even without action by the Commission.
Steps can, and should, be taken to reduce disparities in sentences under the Major Crimes Act and are supported by precedent. Namely, many disparities in sentences could be avoided if district courts were encouraged, if not required, to consider sentences imposed and time actually served for similar state-law crimes when sentencing Indian defendants under the Major Crimes Act.
C. Solution
As stated above, a limited resolution to the disparity problem is to require district courts to take into account sentences and actual time served for similar state-law crimes along with calculating a sentence under the Guidelines. My position is supported by this Court’s precedent.
In 1990, we faced the question of whether the Guidelines passed in 1984 applied to crimes under the Major Crimes Act. Norquay, 905 F.2d at 1159-60. Ultimately, we concluded the Guidelines applied.[8] Id. at 1161. But in so holding, we noted that application of the Guidelines did “not defeat Congress’ desire that Indians and non-Indians committing the same crime be subject to the same punishment.” Id. (emphasis added). Instead, we held that the Guidelines apply to crimes committed under the Major Crimes Act, “but that the sentence imposed may not exceed any maximum sentence and may not fall below any mandatory minimum sentence that is required under the law of the state in which the crime occur[ed].” Id. (emphasis added).
This Court’s holding in Norquay has been applied in a number of Circuits. See, e.g., United States v. Male Juvenile, 280 F.3d 1008, 1024 (9th Cir. 2002); United States v. Wood, 386 F.3d 961, 963 (10th Cir. 2004). Further, the Circuits “unanimously agree” that under the Assimilative Crimes Act state sentencing ranges should set minimum and maximum lengths for federal prison terms. United States v. Martinez, 274 F.3d 897, 906 & n.12 (5th Cir. 2001) (listing cases). Yet, in this Circuit, we sometimes tell district courts they have no obligation to consider sentences for similar state-law crimes when a defendant is convicted under the Major Crimes Act. See, e.g., Deegan, 605 F.3d at 635-36 (“It would have been aq error for the district court to consider potential federal/state sentencing disparities”). This approach often results in unfair, prejudicial sentences like the sentence imposed upon Lasley.
This case presents a good example of how consideration of sentences for similar state-law crimes would likely result in a lower sentence for Indian defendants. Here, a jury convicted’ Lasley of two counts of second-degree murder for crimes committed on an Indian reservation within the border of the State of Iowa. Under Iowa law, the mandatory sentence for second-degree murder is fifty-years’ imprisonment. Iowa Code § 707.3; Michael R. Mullins, Office Iowa State Pub. Def., Iowa *920 Criminal Statutes Summary Chart 2 (2013), available at https://spd.iowa.gov/ sites/files/spd/documents/Mullins2013.pdf. An individual is eligible for parole after serving seventy percent of his/her sentence — meaning an individual convicted of second-degree murder is eligible for parole after thirty-five years.[9] Mullins, supra, at 2.
In contrast to Iowa, Lasley’s federal Guideline range was 360 months’ (30 years’) to life imprisonment, without the possibility of parole. Without considering the general fifty-year sentence for second-degree murder convictions under Iowa law, the district court imposed the maximum sentence permitted by the Guidelines as though the crimes were first-degree murder. Thus, Lasley will be incarcerated the rest of his life when there would be a strong probability of release before death had he committed the crimes off the reservation. Such a result undermines the purpose of the Major Crimes Act, to ensure “Indians and non-Indians committing the same crime be subject to the same punishment,” Nor quay, 905 F.2d at 1161, and permits district courts to ignore 18 U.S.C. § 3553(a)’s commands to “provide just punishment” and “avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct,” see Deegan, 605 F.3d at 651, 656-58 (Bright, J., dissenting).
The time has come for federal courts to take action to avoid unwarranted sentencing disparities for individuals like Lasley. Federal courts must take into account sentences and actual time served for similar state-law crimes when sentencing under the Major Crimes Act to ensure Indians in Indian Country do not receive drastically increased penalties for crimes traditionally handled in state or tribal court. This is an important first step to resolve the underlying disparities that result from prosecutions under the Major Crimes Act. For this reason, I would remand to the district court for consideration of Iowa state law and practice when imposing Lasley’s sentence.
II.
The second legal infirmity presented is this Court’s precedent that “the Constitution does not preclude a district court from considering acquitted conduct in sentencing a criminal defendant.” United States v. Papakee, 573 F.3d 569, 576 (8th Cir. 2009).[10] This case presents a straightforward example of why the use of acquitted conduct to enhance a defendant’s sentence *921 should be deemed unconstitutional under both the Sixth Amendment and the Due Process Clause of the Fifth Amendment. See id. at 577-78 (Bright, J., concurring); United States v. Canania, 532 F.3d 764, 766-78 (8th Cir. 2008) (Bright, J., concurring).
Many federal judges have expressed the view that the use of acquitted conduct to enhance a defendant’s sentence should be deemed to violate the Sixth Amendment and the Due Process Clause of the Fifth Amendment. Jones v. United States, — U.S. -, 135 S.Ct. 8, 190 L.Ed.2d 279 (2014) (Scalia, J., joined by Thomas & Ginsburg, JJ., dissenting from the denial of cert.); United States v. Bell, 808 F.3d 926, 928-32 (D.C. Cir. 2015) (Millett, J., concurring in denial of the r’hrg en banc); Papakee, 573 F.3d at 577-78 (Bright, J., concurring); United States v. White, 551 F.3d 381, 386-97 (6th Cir. 2008) (Merritt, J., dissenting); Canania, 532 F.3d at 776-78 (Bright, J., concurring); United States v. Mercado, 474 F.3d 654, 658-660 (9th Cir. 2007) (Fletcher, J., dissenting); United States v. Faust, 456 F.3d 1342, 1349-53 (11th Cir. 2006) (Barkett, J., concurring); United States v. Pimental, 367 F.Supp.2d 143, 149-55 (D. Mass. 2005).
In recent years, the Supreme Court directly held the Sixth Amendment, together with the Fifth Amendment’s Due Process Clause, “requires that each element of a crime” be either admitted by the defendant, or “proved to the jury beyond a reasonable doubt.” Alleyne v. United States, — U.S. -, 133 S.Ct. 2151, 2156, 186 L.Ed.2d 314 (2013). Any fact that increases the penalty to which a defendant is exposed constitutes an element of a crime, Apprendi v. New Jersey, 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and “must be found by a jury, not a judge,” Cunningham v. California, 549 U.S. 270, 281, 127 S.Ct. 856, 166 L.Ed.2d 856 (2007). Thus, as articulated by some federal judges, recent precedent regarding the Sixth Amendment and Due Process Clause of the Fifth Amendment supports the conclusion that a district court violates a defendant’s constitutional “rights by making findings of fact that either ignore or countermand those made by thé jury and then reifying] on these factual findings to enhance the defendant’s sentence.” Canania, 532 F.3d at 776 (Bright, J., concurring).
Beginning with the Sixth Amendment, in the past two decades, the Supreme Court has emphasized the central role of the jury in the criminal justice system. Id. (listing cases). The right to trial by jury is designed to guard against oppression on the part of the Government. Duncan v. Louisiana, 391 U.S. 145, 155, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968). Thus, once a defendant chooses to exercise his/her jury-trial right, the government cannot deprive a defendant of liberty absent express permission from the defendant’s fellqw citizens. See Blakely v. Washington, 542 U.S. 296, 305-06, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004) (holding the jury-trial right is a “fundamental reservation of power in our constitutional structure”).
Yet, under this Court’s' current precedent, we permit a district court to ignore express findings by the jury under the . assertion that the fact is a mere “sentencing factor.”[11] In so doing, we not only give *922 the government a “proverbial ‘second bite at the apple’ ” on counts it failed to prove to the jury, but also “entirely trivialize[ ] [the jury’s] principal fact-finding function.” Canania, 532 F.3d at 776 (Bright, J., concurring). By “[permitting a judge to impose a sentence that reflects conduct- the jury expressly disavowed,” a district court is free to interfere with a defendant’s Sixth Amendment rights by directly contradicting the findings of the jury to enhance a defendant’s sentence. Id.
With regard to the Fifth Amendment, the Supreme Court held that “[d]ue process commands that no man shall lose his liberty unless the Government has borne the burden of ... convincing the factfinder of his guilt.” In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (alteration in original) (quoting Speiser v. Randall, 357 U.S. 513, 525-26, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958)). Due process further requires the government to provide adequate notice as to the appropriate sentences stemming from a factfinder’s determination. Cf. Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 313, 70 S.Ct. 652, 94 L.Ed. 865 (1950) (“[T]here can be no doubt that at a minimum they require that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case.”).
As stated before, “consideration of ‘acquitted conduct’ undermines the notice requirement that is at the heart of any criminal proceeding.” Canania, 532 F.3d at 777 (Bright, J., concurring). “In determining guilt or innocence, the jury ... serves not only as a fact-finder but as a means of providing a defendant with notice as to his possible punishment.” Id. Permitting a district court to nullify a jury’s not guilty verdict, with respect to any given charge, by allowing the judge to use the same conduct to enhance a defendant’s sentence eviscerates this notice function and “cannot possibly satisfy due process.” Id.
Examining the present case highlights the unconstitutionality of using acquitted conduct to enhance a defendant’s sentence. Here, a jury expressly found Lasley not guilty of first-degree murder — namely, Lasley did not commit murder willfully, deliberately, maliciously, or with premeditation and malice aforethought. See 18 U.S.C. § 1111. The district court, in direct contradiction to this finding, concluded that “Murder in the First Degree was established ... by preponderance of the evidence.” Thus, the district court described Lasley’s crime as “premeditated” and indicated the “starting point” for Las-ley’s sentence was “a life sentence.”
In the mind of the district court, therefore, Lasley’s advisory Guideline range went from a choice of 360 months’ (30 years’) to life imprisonment, to a presumptive sentence of life imprisonment. Such findings do not protect Lasley’s right under the Sixth Amendment to have a jury find every element that will increase his sentence beyond a reasonable doubt. See Apprendi, 530 U.S. at 490, 120 S.Ct. 2348, 147 L.Ed.2d. Neither did the district court’s findings protect Lasley’s guarantee under the Due Process Clause of the Fifth Amendment that he is entitled to fair notice of the precise effect a jury’s verdict will have on his punishment. See Canania, 532 F.3d at 777 (Bright, J., concurring).
Therefore, in my view, the time has come to protect a defendant’s rights under the Sixth Amendment and Due Process Clause of the Fifth Amendment, and overrule existing precedent permitting the use of acquitted conduct to enhance a defendant’s sentence. For this reason also, I would remand for the district court to *923 resentence Lasley consistent with this view.
CONCLUSION
This case presents yet another example that our sentencing system is broken[12] and a new approach must be taken. United States v. Fry, 792 F.3d 884, 898 n.2 (8th Cir. 2015) (Bright, J., concurring in part and dissenting in part); United States v. Noriega, 760 F.3d 908, 912 (8th Cir. 2014) (Bright, J., concurring); United States v. Stokes, 750 F.3d 767, 772-73 (8th Cir. 2014) (Bright, J., concurring); United States v. Hiveley, 61 F.3d 1358, 1363-66 (8th Cir. 1995) (Bright, J., concurring). Lasley committed a grievous offense. But that does not give federal courts the right to ignore Lasle/s constitutional rights or to punish Lasley more harshly than a white defendant because of Lasley’s status as an Indian in Indian Country. For these reasons, I respectfully dissent.
I suggest that Supreme Court review of these important sentencing issues may be appropriate.

. I concur with the majority as to the jury instruction issue.

. While I recognize existing precedent supports the majority opinion, it is well established that “when governing decisions are unworkable or are badly reasoned,” the law can, and must, change. Payne v. Tennessee, 501 U.S. 808, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). Here, precedent from this Court permits a federal district court to impose an unfair sentence and, therefore, the law must change.

.While imprecise to describe Native Americans and their reservation lands, I use the terms "Indian” and "Indian Country” because both are legal terms of art that appear in the Major Crimes Act, 18 U.S.C. §1153. See Tribal Issues Advisory, Group, Report 4, 16-17 (2016) [hereinafter TIAG Report] (citing United States v. Stymiest, 581 F.3d 759, 762-64 (8th Cir. 2009)), available at http://www. ussc.gov/research/research-publications/ report-tribal-issues-advisory-group.

. The enumerated crimes are “murder, manslaughter, kidnapping, maiming, a felony under chapter 109A, incest, a felony assault under section 113, an assault against an individual who has not attained the age of 16 years, felony child abuse or neglect, arson, burglary, robbery, and a felony under section 661 of this title within the Indian country.” 18 U.S.C. § 1153(a).

. At the time the Guidelines were adopted, the only special consideration given to Indians concerned the treatment of prior tribal court convictions. TIAG Report at 17 n.16. Specifically, U.S. Sentencing Guidelines Manual §4A1.2(I) provides that “[sjentences resulting from tribal court convictions are not counted, but may be considered ... [for] [a]dequacy of [criminal [h]istory.”

. Deegan’s case is discussed extensively in BJ Jones & Christopher J. Ironroad, Addressing Sentencing Disparities for Tribal Citizens in the Dakotas, 89 N.D. L. Rev. 53, 69-72 (2013).

. As stated above, later in 1990 Congress codified this Court’s holding that the Guidelines applied to the Major Crimes Act by amending the statute. Crime Control Act of 1990, Pub. L. No. 101-647, § 1602, 104 Stat. 4789 (1990).

. It is true that Iowa law permits consecutive sentences when a person is "sentenced for two or more separate offenses.” Iowa Code §901.8. Thus, for two counts of second-degree murder under Iowa law, Lasley could serve one-hundred-years’ imprisonment with the possibility of parole after seventy years. See Mullins, supra, at 2. But, to date, there is not a single example of an individual being convicted of two counts of second-degree murder and serving consecutive sentences. Email from Steve Michael, Divisional Adm'r, Iowa Dep’t of Human Rights, to Heather Quick, Assistant Fed. Pub. Def. (Jan. 4, 2016, 13:25 CST).

. This Court's precedent relies upon the Supreme Court’s opinion in United States v. Watts, 519 U.S. 148, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997) (per curiam). United States v. Whatley, 133 F.3d 601, 606 (8th Cir. 1998). But Watts does not stand for this broad proposition. In Watts, the Supreme Court addressed the "very narrow question” of whether the Double Jeopardy Clause was violated when the district court considered acquitted conduct while sentencing the defendant under the Guidelines. United States v. Booker, 543 U.S. 220, 240 & n.4, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005). In Booker, the Supreme Court held Watts did not address whether the use of acquitted conduct generally violates the Sixth Amendment. Id. Because Watts does not bind this Court regarding the propriety of using acquitted conduct at sentencing under the Sixth Amendment and the Due Process Clause of the Fifth Amendment, I question whether this Court’s precedent is correct.

. To be sure, the Supreme Court generally permits judicial fact-finding by preponderance of the evidence at sentencing that goes beyond the elements of the crime. See, e.g., United States v. O'Brien, 560 U.S. 218, 224, 130 S.Ct. 2169, 176 L.Ed.2d 979 (2010). But these precedents do not resolve the greater question of whether the Sixth Amendment and the Due Process Clause of the Fifth Amendment permit a district court to increase the length of a defendant’s sentence “based on facts that were pubmitted directly to and rejected by the jury m the same crimi *922 nal case.” Bell, 808 F.3d at 930 (Millett, J., concurring in the denial of r’hrg en banc).

. The Executive Branch has also described the federal sentencing system is “broken.” See Neil Eggleston, White House Counsel to the President, President Obama has Now Commuted the Sentences of 348 Individuals, White House (June 3, 2016, 3:30 PM), https://www. whitehouse.gov/blog/2016/03/30/president-obama-has-now-commuted-sentences-348-individuals; Eric Holder, Attorney General of the United States, United States Department of Justice, Remarks at the Annual Meeting of the American Bar Association’s House of Delegates (Aug. 12, 2013), available at http:// www.justice.gov/iso/opa/ag/speeches/2013/ag-speech-130812 .html.